**Freddie HAMILTON, et al., Plaintiffs,**

v.

**ACCU–TEK, et al., Defendants.**

**No. CV–95–0049 (JBW).**

United States District Court,
E.D. New York.

Dec. 10, 1998.

Elisa Barnes, Peter Sistrom, New York City, for Plaintiffs.

Budd Larner Gross Rosenbaum Greenberg & Sade, Short Hills, NJ by David R. Gross, David Scott Paul, Pamela B. Betlow, for Defendants.

## MEMORANDUM

WEINSTEIN, Senior District Judge.

This is an action by nine plaintiffs, representing the estates of persons killed by handguns, and in one case the guardian ad litem of a survivor of a shooting, against many handgun manufacturers and distributors. Motions to dismiss on the ground of lack of personal jurisdiction were filed by a number of distributor defendants.

The magistrate judge recommended that the claims against eight defendants be dismissed and that motions to dismiss by fourteen others be denied. *See* Report and Recommendation of Magistrate Judge Cheryl L. Pollak dated August 6, 1998, redacted by agreement of the parties to exclude sensitive sales information, *infra* ("Report"). At a hearing the operative portions of the Report were affirmed. *See* Transcript, September 18, 1998. This Memorandum reflects the basis for the court's oral decision.

The reasoning of the district judge and magistrate judge differ on one point—applicability of the jurisdictional analysis in *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992), approved in *In re New York County DES Litigation,* 202 A.D.2d 6, 615 N.Y.S.2d 882, 884 (1st Dep't 1994), and Harold L. Korn, *Rethinking Personal Jurisdiction and Choice of Law in Multistate Mass Torts,* 97 Colum. L.Rev. 2183 (1997).

One of the plaintiffs' substantive theories is that defendants negligently marketed their handguns in various parts of the country and that, foreseeably, these guns made their way into the hands of New York's and other states' criminals, who used them to kill and wound. *See Hamilton v. ACCU–TEK,* 935 F.Supp. 1307, 1330 (E.D.N.Y.1996). Defendants' negligent marketing practices, plaintiffs contend, created an excessively large nationwide market in, and reservoir of, guns, leading to the individual shootings that are the subject of this case. *Id.* Plaintiffs have analogized these handguns to pathogens, exposure to which has caused widespread injury and death. *Id.* at 1313. The rationale for plaintiffs' claims of widespread adverse effects of handguns is similar to that of mass tort claimants in, for example, the asbestos, Agent Orange, Dalkon Shield and silicone breast implant litigations. Plaintiffs' theory shares a number of other features typical of mass torts, including geographically diffuse tortious conduct and impact, difficulty in tracing a particular plaintiff's injury to a particular defendant's actions, and problems in determining the number of potential defendants and their relative degrees of culpability. *See, e.g.,* Deborah R. Hensler, *A Glass Half Full, A Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation,* 73 Tex. L.Rev. 1587, 1595–97 (1995) (discussing nature and characteristics of mass torts).

If handguns are characterized as fungible for purposes of this jurisdictional motion, then, plaintiffs argue, the jurisdictional rule applied in the diethylstilbestrol (DES) litigation in *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992) and *In re New York County DES Litigation,* 202 A.D.2d 6, 615 N.Y.S.2d 882 (1st Dep't 1994), applies. Since sales of a "fungible" product anywhere in the national market would affect sales in the New York market, plaintiffs contend, sellers anywhere could be found for jurisdictional purposes to have been participating substantially in the New York market, and, therefore, to be subject to New York's long arm jurisdiction.

The DES jurisdictional analysis was referred to by the magistrate judge as the "pond theory" since the national market for some products may be considered a "common economic pond that knows no state boundaries," and introduction of the product into any part of the market would have foreseeable ripple effects throughout the country. *See* Report at 15–16, *infra; In re DES Cases,* 789 F.Supp. 552, 576 (E.D.N.Y.1992). To be contrasted is the more traditional "stream of commerce" theory relied upon by the magistrate judge which has lead in some cases to a more restrictive scope of personal

jurisdiction. *See also* Harold L. Korn, *Rethinking Personal Jurisdiction and Choice of Law in Multistate Mass Torts,* 97 Colum. L.Rev. 2183 (1997) (noting the potential benefits of *Ashley's* wider application).

Summarizing the views of the parties and concluding that handguns are not governed by the DES rule, the magistrate judge wrote:

> [D]efendants contend, and this Court agrees, that the DES pond theory of personal jurisdiction should not be applied here because, *unlike DES, handguns are not generic products sold interchangeably.* There are numerous models and designs of guns with different calibers and ammunition capacity. Each handgun is marked with the manufacturer's name and a unique serial number. Once the gun is located, the identification of the manufacturer may be ascertained, and even when the gun itself cannot be located, each weapon leaves a "fingerprint" or "track" on the discharged bullet which can be identified through various ballistics tests.

> Plaintiffs, however, claim that the guns used to shoot all of the plaintiffs' decedents are fungible in their non-identifiability ...arguing that because guns are often not recovered from the scene of a crime, and because, as defendants concede, it is often difficult to conduct ballistics tests without the actual weapon for comparison purposes, guns are a generic product similar to DES. However, even though a positive manufacturer identification cannot be made when the gun from which a bullet was fired is unknown, plaintiffs' own ballistics expert, Steven Colangelo, testified at his deposition that with respect to the guns that were not recovered, it was possible to eliminate certain manufacturers based on measurements taken of the discharged bullet.... In accordance with this testimony, Colangelo, conducted ballistics analyses and produced at his deposition lists of firearms that in his opinion were potentially used at each shooting. *In this Court's view, the fact that guns were used in criminal activity may not always be recovered or identified to a 100% certainty does not*

> *transform guns into an inherently generic product.*

*See* Report at 17–18, *infra* (emphasis added) (internal quotation marks and citation omitted).

The term "generic" was used by the magistrate judge as equivalent to the word "fungible." This identity of definition was appropriate in the DES cases where the chemical formula of the product of each producer was the same for pharmacological purposes. *See Edwards v. A.L. Lease & Co.,* 46 Cal.App.4th 1029, 54 Cal.Rptr.2d 259, 262 (1st Dist.1996) (the DES cases "dealt with a fungible product manufactured from the same formula, which was inherently defective for its intended purpose by reason of design"). The dictionary definition of these two terms overlaps. Webster's New Twentieth Century Dictionary of the English Language (2d ed.1979) defines "fungible" as "designat[es] goods, as grain, any unit or part of which can replace another unit ... capable of being used in place of another," while "generic" refers "to a kind, class or group" with the same characteristics. *See also* Black's Law Dictionary (6th ed.1990).

It is the characteristic relevant to the matter at issue that determines whether a product is the same as and substitutable for another, and therefore, whether the two are interchangeable, that is to say, "fungible" for purposes of jurisdictional or substantive law. Two products interchangeable for one purpose may not be for another. Thus, for signalling New Year's Eve, a blast from an auto horn and one from a saxophone may be equivalent as noise, but few would want to dance to the former.

The jurisdictional issue is not encompassed in catch-all words like "generic" or "fungible." The question is whether the market in the state seeking to exercise personal jurisdiction, S–1, is so affected by market activities in other states, S–2 to S–N, as to affect the policies S–1 is seeking to effectuate. Even such diverse products as steel, aluminum, plastic and wood, when competing in the market for structural supports, may be competing in the same market for antitrust and other purposes; producers in S–2 to S–N may be substantially affecting the market

and policies of S–1 and subject to personal jurisdiction in S–1.

It is true that certain types of handguns are more likely to be weapons of choice for a variety of lawful users or for criminals generally and in specific categories. Many criminals would undoubtedly prefer a high-grade, reliable automatic or semi-automatic to a Saturday Night Special, and drug dealer-defendants in this district seem to have a penchant for guns that can spray large quantities of bullets on a single pull of the trigger. *See, e.g.,* Michael J. Folio, *The Politics of Strict Liability: Holding Manufacturers of Nondefective Saturday Night Special Handguns Strictly Liable After Kelley v. R.G. Industries, Inc.,* 16 Hamline L.Rev. 147, 158 n. 57 (1992) (noting "fatally-flawed premise, that because Saturday Night Special handguns are cheap, easily concealable, and made of low quality materials they are the weapon of choice among criminals"). But, so too, even in the field of pharmaceuticals, and of DES particularly, the high percentage of the market held by well known brands, while suggesting consumer preference for certain producers, does not negate a pharmacologically generic-fungible characterization. (Having tried the DES cases, the court takes judicial notice that the pills manufactured by the various manufacturers were not identical, varying in shape, dosage and coloring.)

■ As a convenient killing instrument almost any handgun serves its purpose. For the kinds of criminals responsible for the injury and death of plaintiffs' relatives, any handgun might suffice—or at least so the proof may show. Arguably, from the point of view of those injured by defendants' products, differences among the guns used in the shootings are not relevant. Whether public policy requires consideration of fungibility from the point of view of the manufacturer, the lawful purchaser, the criminal, the victim, or some other vantage, is a question intertwined with the nature of the tort law and policy controlling the case. *For jurisdictional purposes in this case,* the court finds handguns "fungible."

■ Factual assumptions for jurisdiction purposes are based on information available before the trial is completed or summary judgment on substantive issues decided. On a motion to dismiss for lack of personal jurisdiction, the plaintiff has the burden of establishing the court's jurisdiction over the defendants. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). District courts have "considerable procedural leeway" in deciding motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). *Marine Midland Bank v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981). The nature of the plaintiff's burden varies according to the procedure the court uses in deciding the jurisdiction issue. *See, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (elements of jurisdiction "must be supported ... with the manner and degree of evidence required at the successive stages of the litigation"); *Ball v. Metallurgie Hoboken–Overpelt,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990) ("[T]he nature of the plaintiff's obligation varies depending on the procedural posture of the litigation."); 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351, at 247–48 (2d ed.1990). Where no discovery has taken place, "a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996). After a full evidentiary hearing, the plaintiff's burden is to establish jurisdiction by a preponderance of the evidence. *Id.* at 567. Where, as here, some discovery has taken place and there has been a limited evidentiary hearing, plaintiffs must make a *prima facie* showing of jurisdiction. This demonstration "must include an averment of facts, that if credited by the [ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Id.* (quoting *Ball v. Metallurgie Hoboken–Overpelt,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854, 111 S.Ct. 150, 112 L.Ed.2d 116 (1990)). *Cf.* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (2d

ed. Supp.1990) (for purposes of determining jurisdiction, "courts will take as true the allegations of the nonmoving party and resolve all factual disputes in its favor")

Factual decisions made for purposes of determining jurisdiction need not be resolved the same way on a motion for summary judgment or at trial. Plaintiffs have demonstrated a sufficient basis for jurisdiction over most defendants.

So far as the jurisdictional issue in the instant case is concerned, application of the DES rule arguably results in essentially the same conclusion of lack of jurisdiction over specific defendants as was reached by the magistrate judge following traditional jurisdictional analysis. The theory developed for DES cases, has been stated as follows in the form of two principles:

I. The court must first determine if the forum state has an appreciable interest in the litigation, i.e., whether the litigation raises issues, whose resolution would be affected by, or have a probable impact on the vindication of, policies expressed in the substantive, procedural or remedial laws of the forum. If there is an appreciable state interest, the assertion of jurisdiction is *prima facie* constitutional.

II. Once a *prima facie* case is made, the assertion of jurisdiction will be considered constitutional unless, given the actual circumstances of the case, the defendant is unable to mount a defense in the forum state without suffering relatively substantial hardship.

Evidence to be considered in determining the defendant's relative hardship includes, *inter alia*, (1) the defendant's available assets; (2) whether the defendant has or is engaged in substantial interstate commerce; (3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; (4) the comparative hardship defendant will incur in defending the suit in another forum; and (5) the comparative hardship to the plaintiff if the case were dismissed or transferred for lack of jurisdiction.

*In re DES Cases,* 789 F.Supp. 552, 587 (E.D.N.Y.1992).

Further analysis is not required to show that New York has sufficient interest in the safety of its residents and territory from homicide by handgun to satisfy Principle I.

In deciding whether it is fair under the circumstances to require a particular defendant to defend a case in New York, Principle II is applied. Each of the defendants as to which the magistrate judge recommends dismissal is so small in its impact on the market as to have arguably warranted a finding that it would suffer a relatively substantial hardship were jurisdiction over it to be exercised in this case.

Assuming some form of market share liability, plaintiffs will suffer some hardship if jurisdiction over any defendant is denied since a percentage of any recovery equivalent to the dismissed defendants' percentage share of the handgun market will be foregone in the pending New York litigation. The dismissed defendants' total share of the handgun market, however, is so small that the comparative hardship to the plaintiffs is slight.

The fact that Virginia substantive law may apply to one plaintiff whose decedent was killed in Virginia does not affect the applicability of the New York rule on long arm jurisdiction in a case commenced in New York. That another state's substantive law may apply under New York's choice of substantive law principles does not negate personal jurisdiction in New York. *See, e.g., Bensmiller v. E.I. Dupont de Nemours & Co.,* 47 F.3d 79, 81 (2d Cir.1995) (" 'the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits' ") (quoting *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (en banc)); Charles Alan Wright, *Law of Federal Courts* 420–21 (4th ed.1994).

The report of the magistrate judge recommending dismissal of some defendants on jurisdictional grounds is affirmed and adopted.

SO ORDERED.

*REPORT AND RECOMMENDATION*

POLLAK, United States Magistrate Judge.

On July 30, 1996, twenty-eight[1] out of thirty named distributors of firearms (the "distributors") filed a motion to dismiss the Amended Complaint in this action for lack of personal jurisdiction, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure. The distributors argue that: 1) plaintiffs have failed to establish personal jurisdiction over the distributors under the long-arm statute; 2) the distributors lack the minimum contacts with New York that are required to satisfy due process concerns; and 3) the standard for personal jurisdiction set forth in the DES litigation, *In re DES Cases,* 789 F.Supp. 552 (E.D.N.Y.1992), *app. dismissed,* 7 F.3d 20 (2d Cir.1993), is inapplicable to this case. In response, plaintiffs argue that the distributors' direct sales of handguns in New York, when combined with the indirect sales of guns in New York transacted through the "underground market," are sufficient to assert jurisdiction over the distributors based on the principles enunciated in *In re DES Cases.*

On October 25, 1996, the district court heard oral argument on defendants' motions to dismiss and referred the motion to the undersigned to supervise discovery and issue a report and recommendation on the issue of personal jurisdiction.

## BACKGROUND

In October 1995 and April 1996, plaintiffs commenced these actions against thirty distributors, alleging that the distributors, all federal firearms licensees, together with certain named firearms manufacturers, have committed the tort of negligently supplying and distributing handguns to an over-saturated national handgun market. Plaintiffs allege that, as a consequence of this tortious act, criminals have obtained handguns which were then used to injure plaintiffs' decedents, all of whom were New York residents. Plaintiffs allege that despite New York's restrictive firearms policy, "[h]undreds of thousands of guns acquired under the lax laws of other states are sold each year on the streets in this jurisdiction." (Pls.' Mem., dated Dec. 23, 1997, at 5) (citing George D. Newton & Franklin E. Zimring. *Firearms and Violence in American Life,* National Commission on the Causes and Prevention of Violence, A Staff Report (1963) ch. 13, p. 91). Plaintiffs allege that the distributors are the "middle link" in the gun chain, facilitating the flow between manufacturers and retailers or end users.

Defendants, many of which are closely held businesses, contend that they are all domiciled in states other than New York, with some located in remote areas of the United States. None are incorporated or licensed to do business in New York and none have offices in the state. Defendants claim that most of the distributors sell handguns in their local region and that only a few of the named distributor defendants[2] sell more than a *de minimis* number of handguns to retailers in New York. Accordingly, defendants argue that they lack the minimum contacts necessary to confer personal jurisdiction under the long-arm statute.

## DISCUSSION

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, plaintiffs bear the initial burden of establishing that the court has personal jurisdiction over a defendant. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 508, 136 L.Ed.2d 398 (1996) (citing *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir.1994)). Where, as here, the parties have conducted extensive discovery regarding defendants' contacts with the forum state, the plaintiffs' prima facie showing

---

1. Two of the larger distributors, Ashland and Ellett Brothers, do not contest personal jurisdiction.

2. Defendants point out that although there are fifty to sixty firearms distributors operating in the United States, plaintiffs have named only a small portion of the total number of distributors, and, based on the available statistics, have named companies that are not even responsible for half the handguns distributed in the United States. (Defs.' Mem., dated Jan. 16, 1998, at 2–3).

must include facts that, if credited by the trier of fact, would be sufficient to establish jurisdiction. *See id.* at 567. Because this Court was faced with a dispute as to the accuracy of the facts alleged and a serious challenge by defendants to the novel methodology used by plaintiffs to determine defendants' contacts with New York, this Court set an evidentiary hearing for July 10, 1998, after outlining a number of issues about which the court had questions and concerns. However, the hearing was canceled after a representation by the distributor defendants and by plaintiffs at the June 3, 1998 conference before this Court (Tr. at 47–52) that both parties preferred to rest on their papers. Accordingly, this Report issues based solely on the parties' written submissions. In this Report, the Court begins with a traditional analysis and then proceeds to examine both the DES "pond" theory and plaintiffs' hybrid theory, concluding with a recommendation that for a variety of reasons, the court apply a traditional jurisdictional framework to the instant case.

## I. The Traditional Analysis

█ In determining whether personal jurisdiction exists in a diversity action, the courts look to the law of the state in which the court is located: "[t]he amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether the state's assertion of jurisdiction contravenes a constitutional guarantee." *Id.* at 567 (quoting *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963)). Accordingly, the court must conduct a two part inquiry to determine: 1) whether the defendant is amenable to service of process under the state's laws; and 2) whether the court's assertion of jurisdiction over the parties is in accordance with the constitutional requirements of due process. *Id.* (quoting *Savin v. Ranier,* 898 F.2d 304, 306 (2d Cir.1990)); *see also Chaiken v. VV Pub. Corp.,* 119 F.3d 1018, 1025 (2d Cir.1997), *cert. denied,* ——— U.S. ———, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998).

### a. The Long Arm Statute

█ Plaintiffs rely on the New York long arm statute, specifically, C.P.L.R. Section 302(a)(3)(ii), as the basis for jurisdiction over the distributor defendants. This statute provides in pertinent part:

[A] court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent . . . (3) commits a tortious act without the state causing injury to person or property within the state . . . if he . . . (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y.C.P.L.R. § 302(a)(3)(ii) (McKinney 1990). In order to assert jurisdiction under this section, plaintiffs must show that: (1) defendants committed a tortious act outside New York; (2) defendants' tortious activity caused injury to person or property inside New York; (3) defendants should have reasonably expected the act to have consequences in the state; and (4) defendants derive substantial revenue from interstate commerce. *See Kernan v. Kurz–Hastings, Inc.,* 997 F.Supp. 367, 372 (W.D.N.Y.1998); *Fantis Foods, Inc. v. Standard Importing Co.,* 49 N.Y.2d 317, 325, 425 N.Y.S.2d 783, 402 N.E.2d 122 (1980).

One of the key issues in dispute on this motion is whether, under C.P.L.R. § 302(a)(3)(ii), plaintiffs can establish the third prong, known as the foreseeability requirement, that each defendant "expects or should reasonably expect the act to have consequences in the state." This requirement is "intended to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere," *Ingraham v. Carroll,* 90 N.Y.2d 592, 598, 665 N.Y.S.2d 10, 12, 687 N.E.2d 1293 (1997), but the consequences foreseen need not be those that are the subject of the lawsuit. *See In re DES Cases,* 789 F.Supp. at 570 (citing *Allen v. Auto Specialties Mfg. Co.,* 45 A.D.2d 331, 357 N.Y.S.2d 547, 550 (3d Dep't 1974)).

■ Significantly, New York cases addressing the foreseeability requirement after the Supreme Court's decision in *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) have looked to that case, often integrating the "reasonable anticipation of suit" analysis of *World–Wide Volkswagen* with the foreseeability requirements of C.P.L.R. § 302. *See Penny v. United Fruit Co.*, 869 F.Supp. 122, 128 (E.D.N.Y.1994) (RJD) (collecting cases); *see also In re DES Cases*, 789 F.Supp. at 570 (noting that the reasonable expectation analysis is interpreted so as not to conflict with federal due process limits). The "reasonable expectation" test is an objective one, *see Allen v. Auto Specialties Mfg. Co.*, 45 A.D.2d at 332, 357 N.Y.S.2d at 550, and is not satisfied by the mere possibility that a product will find its way into the forum state. *See Cortlandt Racquet Club, Inc. v. Oy Saunatec, Ltd.*, 978 F.Supp. 520, 523 (S.D.N.Y.1997) (citing *Asahi Metal Indus. v. Superior Ct. of Cal.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987)). After *Asahi*, it is clear that foreseeability requires an affirmative or purposeful act invoking the benefits or protections of New York law, *see id.*, or, in other words, there must be evidence of "a discernable effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 970, 564 N.Y.S.2d 865, 866 (3d Dep't 1991); *see also Martinez v. American Standard*, 91 A.D.2d 652, 457 N.Y.S.2d 97 (2d Dep't 1982), *aff'd*, 60 N.Y.2d 873, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983) (holding that foreseeability is restricted by the purposeful affiliation requirement that defendant " 'purposefully avails itself of the privilege of conducting activities within the forum state' ") (quoting *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)).

Foreseeability has been found to be satisfied where a foreign manufacturer enters into an exclusive sales agreement with another corporation to sell its products across the United States, including in the forum state, *see Kernan v. Kurz–Hastings, Inc.*, 997 F.Supp. at 373 (1998); where an internet provider exhibited "tangible manifestations that [it] was attempting to reach a New York market" by stating on its home page that it could help customers across the United States, and by signing up six New York subscribers, *American Network, Inc. v. Access America*, 975 F.Supp. 494, 498 (S.D.N.Y. 1997); where a non-domiciliary defendant sold approximately 5% of its products in New York, and knew that the Tennessee distributor to which its shoes were shipped would distribute to New York retailers, *see Darienzo v. Wise Shoe Stores, Inc.*, 74 A.D.2d 342, 346, 427 N.Y.S.2d 831, 833 (2d Dep't 1980); and where a manufacturer shipped a chain hoist to the ultimate purchaser in the forum state. *See Prentice v. Demag Material Handling, Ltd.*, 80 A.D.2d 741, 437 N.Y.S.2d 173 (4th Dep't 1981).[3]

The fourth element of Section 302(a)(3)(ii), substantial interstate revenue, is " 'intended to exclude non-domiciliaries whose business operations are of a local character.' " *Bensusan v. King*, 126 F.3d 25, 29 (2d Cir.1997) (quoting Report of the Administrative Board of the Judicial Conference of the State of New York for the Judicial Year July 1, 1965 through June 30, 1996, Legislative Document (1967) No. 90). Thus, while the statute was not intended to burden non-domiciliaries with remote connections to the state, the Judicial Conference in proposing the section believed that " 'it might be fair and desirable to exercise jurisdiction over a defendant ... engaged in interstate commerce, whether or not related to New York, the essential difference being that the [party engaging in interstate commerce] is generally equipped to handle litigation away from his business location.' " *PC COM, Inc. v. Proteon, Inc.*, 906

---

**3.** *See also Vecchio v. S & T Mfg. Co.*, 601 F.Supp. 55 (E.D.N.Y.1984) (finding foreseeability where defendant knew or had reason to know that two workstands it made for American Airlines were ordered for use in New York); *Nichols v. Surgitool, Inc.*, 419 F.Supp. 58 (W.D.N.Y.1976) (finding that the sale of 1,088 surgical devices to New York, coupled with advertisements in trade journals and mailings in response to inquiries from the state, was sufficient to find foreseeability); *cf. Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 564 N.Y.S.2d 865 (finding no discernable effort on the part of a German manufacturer who was neither registered nor authorized to do business in New York, had no property, bank accounts, offices, or employees in New York and had sold the product in question to a Massachusetts company).

F.Supp. 894, 906 n. 10 (S.D.N.Y.1995) (quoting *Markham v. Gray*, 393 F.Supp. 163, 166 (W.D.N.Y.1975)).

 The determination as to whether interstate commerce is "substantial" is based on either absolute or relative numbers, requiring an assessment of either the percentage of total revenue that is derived from interstate commerce or the absolute amount of interstate commerce revenue.[4] *See Ronar, Inc. v. Wallace*, 649 F.Supp. 310, 316 (S.D.N.Y.1986). The method used in a particular case should be determined by the specific facts and circumstances of that case, keeping in mind that "the overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." *Id.* This flexible approach is needed so as not to implicate due process concerns. *Id.*

b. *Due Process*

 Once personal jurisdiction is established under state law, the court must next determine whether the assertion of jurisdiction complies with federal due process.[5] The due process requirement for personal jurisdiction is designed to protect parties without meaningful ties to a foreign jurisdiction from being subjected to judgments there. It " 'gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.' " *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 567 (quoting *Burger King Corp. v. Rudzewicz*, 471

U.S. 462, 471–72, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). The due process determination involves an assessment first as to whether the defendant has sufficient contacts with the forum state to justify the exercise of personal jurisdiction, *see International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945),[6] and second, as to whether the assertion of jurisdiction is reasonable under the circumstances and "comports with 'traditional notions of fair play and substantial justice.' " *Id.* at 316, 66 S.Ct. 154. The Second Circuit has recently held that the two prongs of the due process test must be weighed relatively; where a plaintiff's showing on minimum contacts is weak, the reasonableness showing must be greater in order for a forum state to validly assert personal jurisdiction over the defendant. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 568–69.

 The "minimum contacts" portion of the due process analysis protects nonresident defendants from litigating in an inconvenient forum and ensures that federal courts do not exercise jurisdiction "beyond the limits imposed on them by their status as coequal sovereigns in a federal system." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 292, 100 S.Ct. 559. To serve as a basis for personal jurisdiction, the defendant's conduct establishing minimum contacts must be purposefully directed toward the forum state, *see Burger King Corp. v. Rudzewicz*, 471 U.S. at 474–76, 105 S.Ct. 2174, and his connection with the state should lead him to "reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at

4. Cases interpreting the term "substantial" under C.P.L.R. § 302(a)(3)(ii) have based their decisions on caselaw regarding the use of "substantial" under C.P.L.R. § 302(a)(3)(i) since it has been held that there is no meaningful difference between clause (i) and (ii) as to this term. *See Comptoir De L'Indus. Textile De France v. Fiorucci, Inc.*, No. 78 Civ. 3923, 1979 WL 1062, at \*5 (S.D.N.Y.1979) (citing *Allen v. Canadian Gen'l Elec.*, 65 A.D.2d 39, 410 N.Y.S.2d 707 (3d Dep't 1978), *aff'd*, 50 N.Y.2d 935, 431 N.Y.S.2d 526, 409 N.E.2d 998 (1980)).

5. It should be noted that although Section 302(a) of the C.P.L.R. "was not intended to reach the limits of long-arm jurisdiction under the Federal Constitution," *see Kernan v. Kurz–Hastings, Inc.*, 997 F.Supp. at 372 (citing *In re DES Cases*, 789 F.Supp. at 569), and "[o]rdinarily ... if jurisdiction is proper under [§ 302], due process will be satisfied," *Topps Co., Inc. v. Gerrit J. Verburg Co.*, 961 F.Supp. 88, 90 (S.D.N.Y.1997), a separate analysis of the federal due process concerns is still necessary.

6. The due process evaluation of "minimum contacts" is analogous to the "foreseeability plus purposeful act" test for determining long-arm jurisdiction under the C.P.L.R. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 567; *Bensusan Restaurant Corp. v. King*, 937 F.Supp. at 300–01.

297, 100 S.Ct. 559. Thus, "a foreign corporation 'purposefully avails' itself of a particular forum where the corporation places its products into interstate commerce and reasonably foresees that those products will be delivered into that forum." *Kernan v. Kurz–Hastings, Inc.*, 997 F.Supp. at 374. Thus, "[t]he forum state does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce *with the expectation* that they will be purchased by consumers in the forum state." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297–98, 100 S.Ct. 559 (emphasis added). However, the law is well-settled that generally, the placement of a product into the stream of commerce, without more, is not enough to establish purposeful activity directed toward a state sufficient to confer personal jurisdiction. *See Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. at 112, 107 S.Ct. 1026; *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. at 297, 100 S.Ct. 559.

Following its decision in *World–Wide Volkswagen*, the Supreme Court in *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92, split over whether, in products liability cases, merely placing a product into the stream of commerce is sufficient to establish minimum contacts where the manufacturer or retailer is aware that its product may be sold in the forum state. While four of the Justices believed that was sufficient, four others concluded that "merely placing a product into the stream of commerce with knowledge that it may be swept into a particular forum," is not sufficient and that a further showing of some affirmative act directed at the forum state is required. *Kernan v. Kurz–Hastings, Inc.*, 997 F.Supp. at 375 (citing *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. at 112, 107 S.Ct. 1026). Although the Circuits have subsequently divided over which stream of commerce standard to

adopt, the Second Circuit in *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 567–68, has adopted a different approach that focuses on whether "general" or "specific" jurisdiction is asserted.

▆ In establishing minimum contacts, plaintiffs must either establish that "specific" jurisdiction exists through a showing that plaintiffs' claims arise from or are related to a defendant's activities in the forum, or that "general" jurisdiction, based on defendant's "continuous and systematic general business contacts," exists. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–16, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 567–568. In determining whether the litigation stems from injuries arising from defendant's activities in the forum, one court has suggested that the inquiry should focus on whether "the plaintiff would ... have suffered the same injury in the absence of the defendant's contacts with the forum." *Kernan v. Kurz–Hastings*, 997 F.Supp. at 376. In a "specific" jurisdiction case, the plaintiff must establish that "the litigation results from alleged injuries that 'arise out of or relate to' those activities," and "that the defendant has 'purposefully directed' his activities at residents of the forum." *Burger King Corp. v. Rudzewicz*, 471 U.S. at 472, 105 S.Ct. 2174 (citations omitted).

▆ When the case is predicated on "general" jurisdiction and the events that give rise to the suit are unrelated to any activities conducted by the defendant in the forum, a more stringent showing of minimum contacts is required than if specific jurisdiction was asserted. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 568.[7] For general jurisdiction, the courts have required a showing of "continuous and systematic business contacts" with the forum. *Metropolitan Life Ins. Co. v. Robertson–Ceco Co.*, 84 F.3d at 568. Continuous and system-

---

7. The minimum contacts analysis is "fact-intensive" and the Second Circuit has directed courts to examine a defendant's contacts with the forum state over a reasonable time period under the circumstances. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.* 84 F.3d at 569. The usual time period for assessing minimum contacts is a period of years prior to the initiation of the lawsuit. *Id.* (citing cases suggesting that the appropriate time period is from five to seven years). Here, the court looks to the period for which discovery was ordered— 1992 to the filing of the lawsuit.

atic general business contacts have been found where the defendant had an office, maintained records, and held corporate meetings in the forum, albeit for a limited period of time. *See Perkins v. Benguet Consol., Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). However, where a defendant merely made a purchase of equipment in the forum state, sent employees into the state for training and sent one officer for contract negotiations, but never operated or solicited business or sold products reaching the forum, general jurisdiction was not found. *See, e.g., Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404.[8]

With respect to the second element in the due process analysis—the reasonableness inquiry—courts look to a five-factor test entailing an evaluation of:

> (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies.

*Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d at 568. Although courts generally should not dismiss a case for lack of personal jurisdiction based on an application of the reasonableness test once minimum contacts or purposeful activity has been established, the Second Circuit recently did so upon a careful evaluation of the above-mentioned factors. In *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560, a New York corporation sued a non-domiciliary in District Court in Vermont, alleging that the defendant had supplied faulty curtain walls for the construction of a bank owned by plaintiff. The claim of jurisdiction was based on a theory of general jurisdiction where all of the acts related to the suit had occurred in Missouri, Texas and Florida, and the only contact with Vermont was defendant's general business contacts, which included $4 million in sales to the forum, its relationship with dealers selling its products, visits to those dealers, advertising and support services, and the deliberate targeting of firms in the forum. In affirming the dismissal of defendant from the case based on lack of personal jurisdiction, the Second Circuit held that although these activities satisfied the minimum contacts requirement, traditional notions of fair play and substantial justice would be violated if defendant were to be haled into a Vermont court. In terms of the burden on the defendant, the court found that this factor cut slightly in favor of defendant since none of the records, files, or witnesses were located in the forum, although the court noted that modern communication and transportation methods would ease the burden. The court found that the interest of the forum state, Vermont, in providing redress to its own citizens for out-of-state injuries was not implicated since the plaintiff was a New York citizen. Similarly, other factors, including the interests of the plaintiff in obtaining convenient and effective relief and the efficient administration of justice, would not be served by prosecuting the suit in

---

8. Although there is no clear line delineating what is sufficient in terms of numbers of sales or amounts of revenue for general jurisdiction, the Second Circuit recently addressed this issue in two cases. *See, e.g., Chaiken v. VV Publishing Corp.* 119 F.3d 1018 (2d Cir.1997) (where the Second Circuit held that the forum contacts of the defendant publisher which was sued for libel—namely, circulation of four copies of an Israeli newspaper delivered daily to Massachusetts, amounting to .0004% of the paper's total circulation, and 183 copies of the weekly Sunday edition— did not create sufficient contacts to satisfy the due process clause), *cert. denied,* — U.S. —, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998); *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d 560 (holding that $4,000,000 in sales in the forum state over a seven year period, which amounts to an average of $571,428.57 per year, may not be sufficient to satisfy the "continuous and systematic" business requirement standing alone). Clearly, where the number of sales and the absolute and relative amount of revenue generated in a forum is minimal, a defendant should not be subject to the general jurisdiction of the forum. *See, e.g., Day v. Snowmass Stables, Inc.* 810 F.Supp. 289 (D.Col.1993) (finding no general personal jurisdiction where the defendant, a manufacturer of neck yoke rings, had only one contact with the forum state which were sales of less than $700 per year to two forum-based entities, constituting only 0.5% of defendant's business).

Vermont given the plaintiff's citizenship and the out-of-state location of the witnesses and evidence. The court noted that Vermont's statute of limitations, which made the forum the only jurisdiction in which plaintiff's suit could be brought, was not a valid consideration. Finally, no policy argument as to the state's interest in promoting a particular social policy was articulated by plaintiff and this factor did not weigh in favor of either party.

## II. The DES "Pond" Theory

Plaintiffs urge this Court to go beyond the traditional jurisdictional analysis. They argue that "[t]he handgun market distributors are particularly suited to the mass tort jurisdictional analysis set forth by this Court in *In Re DES Cases*, 789 F.Supp. 552 (E.D.N.Y. 1992) and followed by the New York State Courts in *In re New York County DES Litigation, Carrano v. Abbott Laboratories*" (Pls.' Mem., dated Dec. 23, 1997, at 30), although they acknowledge that this case "does not fall entirely within the parameters of *In re DES Cases*." (Pls.' Mem., dated June 10, 1998, at 8).

In *In re DES Cases*, the court articulated a jurisdictional analysis for mass torts known as the "pond theory" which stems from a series of cases designed to alleviate the evidentiary hurdles faced by plaintiffs who had been injured as a consequence of the use of the diethylstilbestrol ("DES"). These DES plaintiffs could not, due to the generic nature of the product, identify the actual manufacturer responsible for the DES tablets used in any particular case. The pond theory, in part, was a natural extension of the New York Court of Appeals decision in *Hymowitz v. Eli Lilly & Co.*, 73 N.Y.2d 487, 541 N.Y.S.2d 941, 539 N.E.2d 1069, *cert. denied*, 493 U.S. 944, 110 S.Ct. 350, 107 L.Ed.2d 338 (1989), where the court adopted a national market share method for apportioning tort liability. Under this market share analysis, each defendant would be held severally liable for a plaintiff's damages based on the proportion of the manufacturer's share of the total market at the time of exposure. Only those defendants who could establish that they never marketed DES to pregnant women were exempt from liability.

In denying a motion to dismiss for lack of personal jurisdiction in *In re DES Cases*, the Honorable Jack B. Weinstein, United States District Judge, analyzed the impediments placed in the way of plaintiffs by the "purposeful availment" tests of the *World Wide Volkswagen* and *Asahi Metal Industry* cases and sought to distinguish the DES cases from the standard products liability case brought by an individual plaintiff, who has been injured by a particular item, against defendants known to have manufactured or sold that particular item. By contrast, DES was marketed nationally, was a fungible, generic product produced by numerous manufacturers and sold interchangeably to consumers who were unaware of the source of the product they were consuming. In describing the DES market, the court stated that it was "a common economic pond that knows no state boundaries," so that "substantial interjection of products at any point of the national market has ripple effects in all parts of the market." 789 F.Supp. at 576. Under these circumstances, the court held that personal jurisdiction may be asserted as long as there is: 1) an appreciable state interest in adjudicating the claim; and 2) no substantial hardship to the defendant. *See id.* at 587. Suggesting that this principle should be applied not only to the DES cases but also "perhaps in other mass tort cases" *id.*, the court set forth several factors to consider in determining defendant's hardship, including: 1) the defendant's available assets; 2) whether the defendant is engaged in substantial interstate commerce; 3) whether the defendant is being represented by an indemnitor or is sharing the cost of the defense with an indemnitor or co-defendant; 4) the comparative hardship to defendant to defend the suit in another forum; and 5) the comparative hardship to plaintiff if the suit were dismissed or transferred for lack of jurisdiction. *Id.*

With respect to the application of the pond theory to the instant case, there are, on the one hand, several important policy concerns that might argue for an application of the *DES* framework to this case. For one, due to problems in proving causation against any single handgun distributor, plaintiffs may

never be able to bring a lawsuit and seek compensation for the deaths of their loved ones. Even where ballistics analysis could narrow down the potential manufacturers of the gun used in a shooting, plaintiffs would have to search for a forum where all of the parties would be amenable to suit, or, in the alternative be forced to bring multiple suits in order to have full redress. In addition, aside from the obvious interest New York has in providing relief to its citizens who have been victims of torts committed outside the state, *see Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 574, the New York legislature has articulated a strong interest in gun control. (*See* Pls.' Mem, dated Dec. 23, 1997, at 4–5).

However, there are several clear differences between handguns and DES that militate against applying the pond theory to this case. Preliminarily, this Court notes that Judge Weinstein previously told plaintiffs at oral argument: "You really do have to rely on the stream of commerce theory, I believe, of the *Volkswagen* case and the other Supreme Court cases rather than the pond commerce case theory of In re *DES Cases*." (Tr. of Hrg. before Hon. Judge Weinstein, dated Oct. 25, 1996, at 45).

In support of this position, defendants contend, and this Court agrees, that the DES pond theory of personal jurisdiction should not be applied here because, unlike DES, handguns are not generic products sold interchangeably. There are numerous models and designs of guns with different calibers and ammunition capacity. Each handgun is marked with the manufacturer's name and a unique serial number. Once the gun is located, the identification of the manufacturer may be ascertained, and even when the gun itself cannot be located, each weapon leaves a "fingerprint" or "track" on the discharged bullet which can be identified through various ballistics tests.

Plaintiffs, however, claim that "the guns used to shoot all of the plaintiffs' decedents are fungible in their non-identifiability" (Pls.' Mem., dated June 10, 1998, at 8), arguing that because guns are often not recovered from the scene of a crime, and because, as defendants concede, it is often difficult to conduct ballistics tests without the actual weapon for comparison purposes, guns are a generic product similar to DES. However, even though a positive manufacturer identification cannot be made when the gun from which a bullet was fired is unknown, plaintiffs' own ballistics expert, Steven Colangelo, testified at his deposition that with respect to the guns that were not recovered, it was possible to eliminate certain manufacturers based on measurements taken of the discharged bullet. (Colangelo Dep., at 109–13, 235–40, 253–58, 283–88, 355–60, Ex. B to Defs.' Mem., dated June 22, 1998). In accordance with this testimony, Colangelo, conducted ballistics analyses and produced at his deposition lists of firearms that in his opinion were potentially used at each shooting. In this Court's view, the fact that guns used in criminal activity may not always be recovered or identified to a 100% certainty does not transform guns into an inherently generic product. The evidentiary difficulties in identifying the defendants responsible for the manufacture of the subject product are not present in this case to the same extent they were in the DES litigation.

In addition, it is questionable whether the handgun market is a national market in the same way that the DES market was a national one. Some companies manufacturing DES "conducted national advertising" and employed a "national corps of salespersons hawk[ing] the drug in doctors' offices in every part of the country." "Even companies producing exclusively for local markets relied on the nationally developed understanding and consensus about DES and used knowledge and chemicals from all parts of the United States." In re *DES Cases*, 789 F.Supp. at 557. Thus, the small company selling DES benefitted from the marketing of the large company, and "by competing to establish a territorial niche within the national DES market, every manufacturer directly or indirectly benefitted from [interstate commerce] ... by participating in the national market for a generic good." *Id.* at 576. This was possible since all of the companies peddled the same good, and logically, customer preferences therefore played no part of a company's success. By contrast, customer

preferences and loyalty are significant in the market for handguns which are manufactured in countless varieties with countless features. The marketing efforts of one company would, in all likelihood, do little to boost the sales of another. Indeed, there is fierce competition between the manufacturers and distributors of firearms, focused in part on promoting the particular features of their product over their competitors' products. Therefore, the local distributor with little or no contact with New York would not participate in or benefit from any "national" market in the same sense that the DES distributor or manufacturer would have.

It is unclear whether courts are going to apply the *In re DES Cases* jurisdictional analysis to other mass tort cases.[9] Indeed, at least one court has already rejected this framework for DES litigation. *See Boaz v. Boyle & Co.*, 40 Cal.App.4th 700, 46 Cal. Rptr.2d 888 (2d Dist.1995). In any event, the facts particular to this litigation involving handguns make it an inappropriate candidate for the application of the DES jurisdictional framework.

### III. Plaintiffs' Hybrid Theory

While appearing to concede that strict application of a *DES* analysis is inappropriate here, plaintiffs have submitted supplemental letters, dated March 3, 1998 and June 10, 1998, in support of their novel theory of personal jurisdiction, which appears to apply a market share analysis within the confines of the traditional jurisdictional analysis. Essentially, they contend that those distributors who have "sales" of handguns in New York which amount to 1% or more of their total national sales should be subject to personal jurisdiction using the traditional analysis under the long-arm statute. In calculating "sales," however, plaintiffs use a methodology that includes not only the claimed sales of handguns made by a particular distributor to New York during a specified time period, but also attributes to each distributor defendant a certain percentage of handguns that are initially distributed in states other than New York and then ultimately transported to and resold in New York through the illegal "underground" market.

Essentially, plaintiffs provide their own sets of revenue generated in New York by each distributor defendant, calculating both "direct" sales to New York retailers by each defendant, as well as "indirect" sales, which take into account the number of handguns entering New York via the underground market from "feeder states," to which the distributor defendants sell handguns through retailers located in those states. Plaintiffs argue that both the direct and indirect sales are evidence of minimum contacts with New York.

Specifically, plaintiffs contend that it is foreseeable to the defendant distributors that sales of guns to retailers in states with lax gun control laws would result in tortious consequences in New York since the distributors have knowledge from the "expanding public record documenting illegal gun trafficking from Southern States into New

---

**9.** Other courts have rejected the *Hymowitz* market share method of apportioning liability for other mass torts. Although this Court has not been called on in this report and recommendation to determine whether a market share theory of apportioning liability should be adopted here, the cases that have rejected the theory are relevant to the extent that they distinguish the products at issue from DES, which is fungible and generic. *See, e.g., Santiago v. Sherwin Williams Co.*, 3 F.3d 546 (1st Cir.1993) (rejecting market share apportioning in lead paint litigation); *210 E. 86th St. Corp. v. Combustion Eng'g, Inc.*, 821 F.Supp. 125, 127 (S.D.N.Y.1993) (holding that the market share theory is inapplicable in asbestosis litigation); *Lee v. Baxter Healthcare Corp.*, 721 F.Supp. 89, 93–94 (D.Md.1989) (rejecting market share in litigation concerning breast prostheses because unlike DES, "breast prostheses are not inherently dangerous products"), *aff'd.*, 898 F.2d 146 (4th Cir.1990); *Case v. Fibreboard Corp.*, 743 P.2d 1062, 1065 (Okla.1987) (holding that "[i]t is of major importance that [*Sindell v. Abbott Labs.*,] was decided in the context of a product that was truly fungible"); *Marshall v. Celotex Corp.*, 651 F.Supp. 389, 393 (E.D.Mich.1987) (holding that "[m]arket share liability was developed for a fungible product, the drug DES"); *Vigiolto v. Johns–Manville Corp.*, 643 F.Supp. 1454 (W.D.Pa.1986), *aff'd*, 826 F.2d 1058 (3d Cir.1987); *Hannon v. Waterman S.S. Corp.*, 567 F.Supp. 90 (E.D.La.1983); *In re Related Asbestos Cases*, 543 F.Supp. 1152, 1158 (N.D.Cal.1982) (holding that "unlike DES, which is a fungible commodity, asbestos fibers are of several varieties, each used in varying quantities by defendants in their products . . . .").

York." (Pls.' Mem., dated June 10, 1998, at 4). As evidence of this public record, plaintiffs have submitted a report written by the staff of Congressman Charles E. Schumer, dated April 9, 1997 (the "Schumer Report;" Ex. D to Barnes Certif.); portions of a report entitled "Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in 17 Communities" done by the ATF Youth Crime Interdiction Initiative, dated July, 1997 (the "ATF Report);" Ex. E to Barnes Certif.); the Affidavit of Dr. Howard Andrews, dated May 7, 1997 (Ex. F to Barnes Certif.); and the Affidavit of Dr. Frederick Dunbar, dated May 6, 1997 (Ex. G. to Barnes Certif.). These exhibits indeed detail the existence and effects of the underground market. For example, based on detailed statistics, the Schumer Report concludes that guns used in crimes are most likely to come from states with weak gun control laws including Florida, Texas, South Carolina, and Georgia. The ATF Report details the most frequent source states for successfully traced crime guns recovered in New York City, broken down by age of the possessor of the gun. For youth possessors (ages eighteen to twenty-four) and juveniles (ages seventeen and under), the top five source states are Virginia, Florida, North Carolina, South Carolina, and Georgia. In his May 7, 1997 affidavit, Dr. Andrews, plaintiff's expert, notes that based on an analysis of the BATF trace database, only 10.7% of the handguns traced in connection with homicides in New York were acquired by sales in New York; 45.08% of all pistols used in homicides in New York State originate in the southeastern states including Alabama, Tennessee, Georgia, South Carolina, Mississippi, North Carolina, Virginia, and Florida. Plaintiffs claim that these findings are consistent with those of the Schumer Report.

Regardless of whether this Court takes formal judicial notice of the existence of an underground market,[10] as plaintiffs request, there is significant publicly available evidence such that any firearms distributor, by virtue of being in that business, should know of or foresee the existence of an underground market which transports guns from the Southeast to states in the Northeast, including New York.

The Court views plaintiffs' request to include indirect sales in a minimum contacts analysis as a "hybrid" jurisdictional analysis, combining aspects of both the traditional C.P.L.R. long arm statute and the *In re DES Cases* framework. Specifically, plaintiffs analogize indirect sales to the sale of DES insofar as "Defendants' activities in one part of the country, for example the southeast, have documented trade flow consequences throughout the nation and especially New York." (Pls.' Mem., dated June 10, 1998, at 8). Moreover, in taking into account indirect sales, plaintiffs' analysis by necessity renounces the "purposeful availment" requirement articulated in the *World–Wide Volkswagen* and *Asahi*—the so-called "stream of commerce" cases— as did the court in *In re DES Cases.*

Plaintiffs' market share attributions are based on their analysis of trace statistics obtained from ATF. Using ATF data regarding handgun traces requested in connection with homicides committed in New York between 1989 and 1997, plaintiffs have determined that the majority of firearms entering the underground market which are used to commit homicides in New York originate in a limited number of states, generally located in the southeast region of the United States. (Repts. of Howard Andrews, dated April 17, 1998 and June 18, 1997). From their analysis, plaintiffs have attributed a percentage of handguns in eight states as follows: Virginia (13.6%), North Carolina (4.4%), South Carolina (4.8%), Georgia (5.7%), Florida (11.6 %), Ohio (6.4%), Texas (7.4%), and Pennsylvania (4.6%). (Pls.' Letter, dated Mar. 3, 1998, at 2). Plaintiffs then utilized the information provided by defendants in response to discovery requests as to the geographical location of their sales. Using the percentages

---

**10.** At the oral argument on October 25, 1996, Judge Weinstein stated:
 The literature and the criminal cases in this court are replete with evidence, I believe, that might be judicially noticed of a large scale internal transportation of handguns from other parts of the country into New York State. Given that situation, ... I cannot preclude the application of Rule [302].

developed from ATF statistics, plaintiffs determined the average percentage of gun traces for the states in that locale, and then, using the distributors' national sales figures,[11] determined the number of weapons that could potentially be transported to New York through the underground market. Plaintiffs' analysis was hampered by the fact that many of the distributors provided limited or no sales data reflecting state sales figures[12] or provided limited[13] or no information at all.[14]

In further support of their argument, plaintiffs have produced an expert report, dated May 1, 1998, which was prepared by Lucy Allen and Jonathan Portes from the National Economic Research Associates ("NERA"). Asked to conduct an economic analysis of the handgun market structure and distribution practices, NERA based its analysis on sales data provided by the Bureau of Alcohol Tobacco and Firearms and a review of literature on the illegal handgun market. According to the NERA Report, the NERA experts reached several conclusions, including: 1) a large proportion of the guns used to commit crimes were sold recently; 2) certain types of guns are more likely to be used by criminals and production of these guns has increased in recent years;

3) there is a substantial amount of interstate smuggling of handguns, most of which is from states with lax gun control laws; and 4) in those states which are the primary sources of weapons used to commit crimes, a disproportionate number of guns are sold relative to the expected level of gun ownership. These findings, plaintiffs contend, support their theory that there is an oversupply of handguns that flow from the South Atlantic states into states like New York where gun sales are heavily regulated and that these weapons imported from other states are then used to commit crimes in New York. Plaintiffs contend that the NERA analysis reinforces plaintiffs' position that this Court should consider not only actual sales of guns in New York but also the number of firearms that could potentially end up in the New York market from sales in these other states.[15]

Based on the data collected and the analysis performed using sales trace data and revenue data, plaintiffs compiled a number of statistics for each distributor reflecting: 1) revenues generated from sales in New York, including revenue derived from indirect sales through the underground market, as a percentage of national revenue; 2) number of

11. Where no information as to national sales figures was supplied by the distributor defendants, plaintiffs provided Dun and Bradstreet reports for use in evaluating certain individual distributors. While the reports are technically hearsay, they are considered accurate insofar as they were prepared for use by those in financial industries without an eye toward litigation. *See Prentice v. Demag Material Handling, Ltd.*, 80 A.D.2d at 742, 437 N.Y.S.2d at 174 (citing Commentary, New York Proposed Code of Evidence (West 1980 Special Pamphlet) § 803(17) pp. 197–98). Moreover, they have been used by courts in determining personal jurisdiction where the defendant "is in sole possession of information that may refute the allegation [relevant to personal jurisdiction]." *Id.*

12. According to plaintiffs' letters, Alamo Leather Goods stated that [ ] of its sales were with customers located in [ ] but otherwise provided no data relating to individual state sales. Similarly, Bangers stated that [ ] of its sales were to [ ] customers, and Brazas said [ ] of their sales were to [ ]. According to plaintiffs, Eagle Exim, Jack First, Graf & Sons, Kiesler Police Supply, and Schaub provided no state sales figures, although Schaub stated that the majority of

its sales were to [ ]. Fox Wholesale, Hill Country, Micro Sight, and Point Sporting Goods, did not provide any information regarding the number of firearms sold nationally. However, according to the defendants' submissions, Micro Sight and Point Sporting Goods did in fact provide national sales figures which this Court has relied on.

13. Chatanooga provided information only for three years— 1994, 1995, and 1996. Lipsey's only provided information for 1995 and the first quarter of 1996.

14. Nationwide Sports Distributors, Inc., SG Distributing, and SOG International provided no information that plaintiffs could use.

15. Defendants object to the Court's consideration of the conclusions reached by NERA, arguing that plaintiffs' submission is not only untimely filed, but that it is once again comprised of mere conclusory statements and not evidence. Moreover, defendants note that many of the statistics generated by plaintiffs' experts do not comport with reality because many of the distributor defendants do *not* sell to "source" states. (Defs.' Letter, dated May 7, 1998 at 1).

guns sold in New York, including direct sales, as a percentage of national sales; 3) number of guns sold in New York using the underground market statistics; and 4) numbers of guns sold nationally. Set forth below are two summary charts of plaintiffs' statistics. The first reflects for each defendant for the period of 1992 to 1995, the number of handguns sold nationally, the direct sales to New York, and sales to New York adjusted in accordance with plaintiffs' methodology to reflect underground sales as well.[16]

| Distributor [17] | Total Sold Nationally [18] | Adjusted Numbers Sold in New York | Direct Sales in New York |
|---|---|---|---|
| REDACTED | | | |
| REDACTED | | | |

The second chart reflects for each distributor, for the period of 1992 to 1995, total national revenue, revenue from direct sales to New York, and the total revenue from New York.[19] Plaintiffs determined each distributor's revenues derived from sales in New York by selecting an average sales price of $392 per handgun as computed by Philip J. Cook and Jens Ludwig.[20]

16. It is not clear from plaintiffs' papers whether the adjusted numbers reflect both direct and indirect sales to New York or whether they reflect only indirect sales.

17. The distributors marked with an asterisk have been voluntarily dismissed from the litigation by plaintiffs. They remain in the charts for comparison purposes only.

18. One of the reasons this Court has not relied on the figures provided by plaintiffs in their March 3, 1998 letter is that it is unclear how these figures were arrived at and whether they represent an annual average calculated over a four-year period or over some other period of time. Based on the figures provided by plaintiffs in the summary pages preceding the interrogatory responses and other exhibits for each defendant, this Court calculated a figure representing the total numbers of national sales, New York sales, total national revenue and New York revenue over the four-year period from 1992 to 1995. These figures were then verified against the actual interrogatory responses. Based on this information, this Court prepared its own tables reflecting each distributor's sales and revenue for 1992 to 1995, for both direct and indirect sales, as well as national revenue. *See infra* at 82. Due to discrepancies between plaintiffs' numbers, for which no source information was provided, and this Court's computations, the Court's

| Distributor | National Revenue | Adjusted N.Y. Revenue | Revenue from Direct N.Y. Sales |
|---|---|---|---|
| REDACTED | | | |
| REDACTED | | | |

Citing *Allen v. Canadian General Elec. Co., Ltd.*, 65 A.D.2d 39, 410 N.Y.S. 2d 707, plaintiffs argue that even those defendants that generate revenues of 1% to 2% from direct and indirect sales to New York should be kept in the case since based on these sales, they should have a "reasonable expectation" that these sales would have an effect in New York. Plaintiffs also argue that this Court should consider the effect that a loss of indirect sales to New York would have on a distributor's total revenue in determining whether the distributor earns enough revenue in New York for general jurisdiction. Based on this analysis, plaintiffs contend that all of the distributor defendants remaining after plaintiffs' voluntary dismissal of five defendants have " 'continuous and systematic,' but limited business operation in New York State which generates substantial revenue" sufficient to confer personal jurisdiction on this Court.[21] (Pls.' Mem., dated Mar. 3, 1998 at 9).

tables have been relied on in this Report to analyze each distributor under the traditional analysis.

19. As with the adjusted sales figures, it is unclear whether the adjusted revenue figures provided by plaintiffs reflect revenue from both direct and indirect sales, or just indirect sales.

20. Plaintiffs concede that they do not know the type of firearms sold by each distributor and although some defendants provided sales price figures ranging from $200 to $300, plaintiffs assert that they chose the $392 as set forth in Cook and Ludwig's article, "Guns in America: National Survey on Private Ownership and Use of Firearms," published in the National Institute of Justice Research Brief in order to "to overcome [the] uncertainty" caused by the fact that these distributors could sell guns priced at anywhere from $100 to $1,000. (Pls.' Letter, dated Mar. 3, 1998, at 3).

Based on their analysis, plaintiffs concluded that Lew Horton, RSR South, Alamo Leather Goods, AcuSport, Sports South, Lispey's, and Bangers, rank in the top ten in revenues generated from New York, including direct and indirect sales as a percentage of national sales.

21. There appears to be some confusion by the parties as to the requirements of C.P.L.R. § 302(a)(3)(ii). While revenue from New York

Defendants argue that plaintiffs' numbers, inclusive of indirect sales, are not evidence that defendants purposefully directed their conduct toward New York, and contend that under plaintiffs' analysis, certain of the distributors should be dismissed in any event because of their minimal contacts with New York.[22] Moreover, defendants claim that they cannot evaluate the calculation of constructive sales in New York as set forth in plaintiffs' submissions to this Court because they do not have all of the underlying information on which it is based. This Court agrees. Apart from a brief and somewhat vague description of methodology, plaintiffs have merely provided this Court with a series of numbers representing the conclusions of their analysis. Nothing has been presented for this Court or defendants to even begin to verify the accuracy of the calculations, even assuming the validity of the methodology.[23]

Particularly troubling are the percentages assigned to each state representing the percentage of guns used in crimes in New York with sales originating in that state. (*See* Table entitled "Weapons Traced in Connection with Homicides in N.Y. State, 1989–1997," attached to Pls.' Mem., dated Mar. 3, 1998). Plaintiffs claim that these numbers are supported by the NERA report and the affidavit and reports of Dr. Howard Andrews. (Pls.' Mem., dated June 10, 1998, at 10). The NERA report, however, details the findings of Allen and Portes, but does not refer to specific percentages. Similarly, the Andrews' reports provide a limited explanation of the expert's methodology but the detail necessary to evaluate the validity and accuracy of the analysis has not been supplied.[24] Given that these percentages are key to determining the amount of indirect sales into New York, which is the hook on which plaintiffs ask the court to base jurisdiction, this Court has grave concerns as to the manner in which they were derived. In the absence of any such information, the Court cannot evaluate either the validity of the methodology or the accuracy of these numbers, and, therefore has only considered direct sales in evaluating personal jurisdiction under the traditional analysis. However, as set forth below, consideration of the plaintiffs' numbers of indirect sales potentially affects only a few of the challenged distributors.

### IV. The Traditional Analysis as Applied to the Instant Case

The application of C.P.L.R. § 302(a)(3)(ii) to this case is not simple. As a threshold matter, defendants argue that plaintiffs cannot establish that defendants committed a tortious act outside the State of New York. Under plaintiffs' theory, each distributor defendant was negligent in the distribution of its products in the sense that it oversupplied handguns to a national market, resulting in

may make it reasonably foreseeable to a defendant that his tortious act would have consequences in New York, *see Darienzo v. Wise Shoe Stores, Inc.,* 74 A.D.2d 342, 427 N.Y.S.2d 831, revenue must be "substantial" with respect to interstate commerce, not with respect to that generated in New York. Substantial revenue from interstate commerce, for purposes of § 302(a)(3)(ii) need not be revenue derived from New York. *See Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 675 F.Supp. 1439, 1446 (S.D.N.Y.1987).

**22.** Specifically, defendants contend that [ ] has never sold a single handgun to a New York retailer and even under plaintiffs' analysis which attributes indirect sales of [ ] guns through the underground market, only [ ] of [ ] business was done in New York, representing only [ ] of their total revenue or [ ]. Another distributor, [ ] and does not sell handguns in New York. Similarly, defendants contend that [ ] Finally, with respect to [ ] defendants argue these dis-

tributors did business only for a limited period of time from 1993 to 1995 and only sold minimal numbers of guns in New York.

**23.** Indeed, the underlying data and the methodology used to compute indirect sales is currently the subject of ongoing expert discovery. One of the purposes for the suggested hearing was to provide the parties with an opportunity to further explain and explore these issues which remain undocumented at least insofar as the court has been provided with information.

**24.** The Andrews' reports were not originally submitted to this Court and the only affidavit from Andrews was previously submitted in connection with information needed during discovery. Pursuant to a recent request from the court, copies of the Andrews' reports were supplied and accordingly reviewed in connection with this motion.

the creation of an underground or black market from which handguns were sold and then used to injure plaintiffs' decedents. Essentially, the claim is negligent distribution. Defendants argue that by pursuing this claim, plaintiffs are, in effect, asking this Court to hold that every otherwise legal sale of a non-defective handgun into the oversupplied market is a tortious act, despite laws in states such as Georgia where, unlike New York, handgun distribution is legal. In essence, defendants contend that plaintiffs are seeking to have the court declare the sale of handguns illegal where Congress and other state legislatures have refused to act. Defendants also argue that plaintiffs have failed to provide evidence that each of the individual distributors actually committed this tort. They contend that plaintiffs' claim that each defendant sold guns into the national handgun market is not sufficient to constitute proof of tortious conduct and thus warrants dismissal of the complaint.

While plaintiffs' theory of liability is indeed novel, this issue was previously addressed by the district court in connection with the motion to dismiss filed by the manufacturer defendants. After oral argument, the court dismissed the plaintiffs' strict liability claims but declined to dispose of the negligence claims on the manufacturers' motion for summary judgment, noting in its written opinion that the issue had not been fully briefed, nor was the issue ripe for decision until discovery on the underlying claims was completed. *See Hamilton v. Accu–Tek*, 935 F.Supp. 1307, 1315, 1325 (E.D.N.Y.1996). Accordingly, regardless of the ultimate merit of plaintiffs' theories, this Court assumes for purposes of this report and recommendation that plaintiffs will be able to establish that each distributor defendant committed a tortious act outside of New York sufficient to satisfy the requirements of the long-arm statute.[25] Injury inside New York is not contested.

a) *Interstate Revenue*

Turning to the remaining two elements necessary to establish long-arm jurisdiction, the first issue to be addressed is whether there is any evidence to show that each of the defendants has substantial interstate revenue. Defendants contend that plaintiffs have failed to provide any creditable evidence that each of the distributors sued here do, in fact, engage in substantial interstate commerce. The reality, as asserted by defendants, is that many are small, local businesses without substantial interstate sales. In an attempt to prove substantial revenue from interstate commerce, plaintiffs have provided, for each distributor, the amount of revenue generated from "[s]ales [i]n [the] United States." (Pls.' Mem., dated June 10, 1998, at 5). It is not clear from plaintiffs' papers, however, that these revenue figures are limited only to revenue derived from interstate commerce; they appear to include sales from the defendants' home state as well. Therefore, the court's analysis is complicated by its inability to determine with respect to certain of these distributors whether the numbers submitted are representative of substantial interstate commerce or include mostly intrastate statistics.

A number of defendants failed to provide specific information regarding numbers of guns sold either nationally or in New York, nor did they supply revenue figures that would allow the court to conduct the type of analysis required under the C.P.L.R. Courts faced with similar circumstances have taken a number of different approaches to the problem.

In some cases, where the plaintiff has failed to submit sufficient evidence of interstate commerce, the courts have dismissed the claims. *See, e.g., Black v. Rawlings Const. Co.*, No. 93 Civ. 8643, 1997 WL 150121, at *5 (S.D.N.Y. Mar.28, 1997) (finding that "[i]n the absence of any evidence of the relative portion of [defendant's] revenues that are derived from interstate commerce or the overall size of [defendant's] revenues," plaintiff "has failed to meet its modest burden of demonstrating even a prima facie case of personal jurisdiction") (quoting *Tonelli v. Chase Manhattan Bank, N.A.*, 49 A.D.2d 731, 372 N.Y.S.2d 662 (1st Dep't 1975)); *KIC Chemicals, Inc. v. ADCO Chemical Co.*, No

---

**25.** Indeed, discovery on the underlying merits of plaintiffs' claims continues and this Court is not in the position to make a recommendation on the theory at this time.

95 Civ. 6321, 1996 WL 122420, at *8 (S.D.N.Y. Mar.20, 1996) (dismissing claims where plaintiff has presented no evidence as to the source or magnitude of defendant's revenues).

However, where defendants submit nothing to defeat a plaintiff's allegations of substantial interstate revenue, some courts have ordered more discovery. *See, e.g., Kelly v. MD Buyline, Inc.,* 2 F.Supp.2d 420, 438–39 (S.D.N.Y.1998) (permitting plaintiff to take further discovery of the defendant where all the information necessary for a determination of revenue from interstate commerce was in the hands of the defendant); *Chemical Bank v. Bright Star Holding, Inc.,* No. 89 Civ. 0609, 1995 WL 447792, at *2 (S.D.N.Y. June 8, 1995); *Glens Falls Cement Co. v. Severn Coal Co.,* No. 89 CV 1092, 1990 WL 15604, at *8 (N.D.N.Y. Feb.14, 1990); *Tonelli v. Chase Manhattan Bank, N.A.,* 49 A.D.2d at 731, 372 N.Y.S.2d at 663 (denying motion to dismiss on grounds that discovery of information in defendant's exclusive custody will cure deficiency). In other instances, courts have refused to dismiss plaintiff's claims. *See, e.g., Local 875 I.B.T. Pension Fund v. Pollack,* 992 F.Supp. 545, 556 (E.D.N.Y. 1998).

Here, this Court has considered all of the information presented and where information is lacking has credited plaintiffs' averments, *see Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.,* 84 F.3d at 567, essentially equating national revenue with interstate revenue. Considering the contentious nature of the litigation in which almost every discovery request has resulted in a dispute, this Court finds that an order requiring further discovery on this issue would not be likely to produce significant additional information.[26] It should be noted that after months of discovery, a number of distributors still have provided little, if any, sales and revenue data responsive to plaintiffs' discovery requests, in many instances claiming an inability or excessive burden in retrieval of the necessary information. Moreover, anticipating this problem, the Court scheduled a hearing to give all parties an opportunity to supplement the record, yet both parties declined the invitation to provide the court with more information. Since the necessary information is in the exclusive control of defendants, where they have failed to provide the information, this Court finds that plaintiffs have satisfied their burden, and the case should proceed.

As noted above, no decision has set an absolute number at which interstate commerce is considered to be "substantial." Instead, the courts, stressing the need for flexibility look to either the percentage of total revenue that is derived from interstate commerce or the absolute amount, keeping in mind the "overall nature of the defendant's business and the extent to which he can fairly be expected to defend lawsuits in foreign forums." *Ronar, Inc. v. Wallace,* 649 F.Supp. at 316. It is clear, however, that Section 302(a)(3)(ii) does not require the substantial interstate commerce to be linked to New York, *see Broadcasting Rights Int'l Corp. v. Societe du Tour de France, S.A.R.L.,* 675 F.Supp. at 1445, but rather the focus should be on whether, because of the extent and non-local nature of a defendant's business, it would be consistent with notions of fundamental fairness to expect defendant to defend in a foreign forum. *See Path Instruments Int'l Corp. v. Asahi Optical Co.,* 312 F.Supp. 805, 810 (S.D.N.Y.1970).

Some courts have held that absolute interstate revenue less than $500,000 is not considered substantial. *See, e.g., United Bank of Kuwait v. James M. Bridges, Ltd.,* 766 F.Supp. 113 (S.D.N.Y.1991) (holding that $300,000 in interstate sales which was between 1% and 8% of total sales was insufficient); *Path Instruments Int'l Corp. v. Asahi Optical Co.,* 312 F.Supp. at 809 ($85,000 not sufficient in absolute terms); *see also Schleich v. Blumenfeld,* No. 82 CV 546E, 1988 WL 27576 (W.D.N.Y. Mar.18, 1988) ($7,000 in interstate revenue not sufficient); *Bank of Calif. v. Smith Barney, Inc.,* No. 89 CV 551, 1997 WL 736529, at *5 (N.D.N.Y. Oct.31, 1997) (suggesting that $31,625 in

---

**26.** Additional merits discovery will need to be conducted in any event once it has been determined which distributor defendants will remain in the litigation and plaintiffs will be free to explore these issues further at that time.

gross income not sufficient); *United Bank of Kuwait v. James M. Bridges, Ltd.*, 766 F.Supp. at 117 (finding that 8% of total revenue of $300,000 or $22,600 was not substantial). On the other hand, other cases have held that revenue in excess of $1,000,000 is considered substantial. *See, e.g., Cavalier Label Co. v. Polytam, Ltd.*, 687 F.Supp. 872, 879 (S.D.N.Y.1988) (holding that $1,000,000 is substantial). *See also Cosmetech Int'l, LLC v. Der Kwei Enterprise and Co.*, 943 F.Supp. 311, 320 (S.D.N.Y.1996) (holding that $19 million in annual revenue was substantial); *Facit Inc. v. Krueger, Inc.*, 732 F.Supp. 1267, 1273 (S.D.N.Y.1990) (interstate sales of more than $4 million found to be sufficient under § 302(a)(3)(ii)); *Nichols v. Surgitool*, 419 F.Supp. at 63 (holding that where defendants' business was national in scope and gross sales totalled over $3.7 million, there was substantial interstate revenue); *Allen v. Canadian Gen'l Elec. Co.*, 65 A.D.2d 39, 410 N.Y.S.2d at 707, 709 (3d Dep't 1978) ($8.79 million earned in New York is substantial revenue even if it constitutes only 1% of defendant's gross revenue), *aff'd*, 50 N.Y.2d 935, 409 N.E.2d 998, 431 N.Y.S.2d 526 (1980). *See generally Daniel v. American Bd. of Emergency Med.*, 988 F.Supp. 112, 254 n. 156 (finding out-of-state revenues ranging from $73,417 to $44,540,966 to be substantial).

Other cases have found substantial interstate revenue where the interstate revenue as a percentage of total revenue was greater than 5%. *See, e.g., Pariente v. Scott Meredith Literary Agency Inc.*, No. 90 Civ. 0547, 1991 WL 19857, at *4 (S.D.N.Y.1991) (75% of total revenue sufficient); *see also United Resources 1988–I Drilling & Completion Program, L.P.*, No. 91 CV 8703, 1994 WL 9676, at * 4 (S.D.N.Y. Jan.10, 1994) (holding that where 5% of the defendant's revenue is derived from interstate commerce, personal jurisdiction under C.P.L.R. § 302(a)(3)(ii) is satisfied). *But see Ronar Inc. v. Wallace*,

649 F.Supp. at 316 (holding that $6,500 in interstate commerce, even if it constituted 20% of defendant's total revenue was not substantial).

b) *Foreseeability*

The Court next addresses whether each of the defendants should reasonably have expected its conduct to have consequences in New York, *see Ingraham v. Carroll*, 90 N.Y.2d at 598, 665 N.Y.S.2d at 12, 687 N.E.2d 1293, and have made "a discernable effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d at 970, 564 N.Y.S.2d at 866. Initially, it should be noted that plaintiffs do not contest the fact that none of the defendants are New York corporations; none are authorized to do business in New York; and none have officers or property in the state. Plaintiffs, however, appear to articulate three types of business contacts with New York: 1) the distributor defendants' membership in the American Shooting Sports Council ("ASSC"), a national trade organization "that seeks to affect production, safety and regulation of firearms, and which has actively lobbied in New York" (Pls.' Mem., dated Dec. 23, 1997, at 2); 2) advertisements placed by some of the distributor defendants in *Shotgun News*, a trade magazine with circulation in New York; and 3) the distributor defendants' direct and indirect sales to retailers or other entities in New York.[27]

1. *ASSC Membership*

Plaintiffs contend that defendants' membership in the ASSC which directs some lobbying efforts toward New York is an indication of defendants' efforts to serve the New York market. Defendants argue, and this Court agrees, that this element plays no significant role in this analysis.[28] Plaintiffs have presented no caselaw and this Court's own research has failed to uncover a case in which membership in an association, standing

---

**27.** These contacts with New York go to both foreseeability under C.P.L.R. § 302(a)(3)(ii), and the minimum contacts required in the federal due process analysis. However, this Court's research revealed no cases in which advertising was considered in the context of C.P.L.R. § 302(a)(3)(ii), nor did the parties provide any authority to this effect.

**28.** Defendants argue, "Under plaintiffs' reasoning, members of national associations, such as the American Automobile Association or the Sierra Club, would be amenable to suit in any state. This is simply not the case." (Defs.' Reply Mem. at 6).

alone, is considered a significant minimum contact sufficient to subject a defendant to the court's jurisdiction.

## 2. Advertising

In connection with this motion, plaintiffs have submitted advertisements placed in a 1993 and a 1995 edition of *Shotgun News*, by Chattanooga Shooting Supplies, Inc. (Ex. 6 to Barnes Certif.), Davidson Supply Company, Inc. (Ex. 7 to Barnes Certif.), Eagle Exim, Inc. (Ex. 8 to Barnes Certif.), Graf & Sons, Inc. ( Ex. 11 to Barnes' Certif.), Kiesler Police Supply, Inc. (Ex. 16 to Barnes' Certif.), and Lew Horton Distributing (Ex. 17 to Barnes' Certif.), which plaintiffs describe as a national trade magazine with some circulation in New York.[29] These ads vary in size, from one-quarter of a page to a full page, displaying pictures of merchandise or detailing the various brands carried and providing telephone and fax numbers to contact for purchases.

The extent of a defendant's advertising and solicitation in a forum state are clearly factors to consider in evaluating whether a court in the forum has personal jurisdiction over that defendant. *See, e.g., Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 570–71. A defendant's advertising through direct-mail or catalogs, specifically targeted toward the residents of a forum state is sufficient to support an assertion of specific jurisdiction, *see Sollinger v. Nasco Int'l Inc.*, 655 F.Supp. 1385, 1388 (D.Vt.1987) (holding that "[i]n sending its catalogs into Vermont to solicit sales ... [defendant] has purposefully directed [its] activities at residents of the forum and this litigation results from alleged injuries that arise out of or relate to those activities") (internal quota-

tions marks and citations omitted), and when coupled with other evidence of purposeful availment, can even support an assertion of general jurisdiction. *See Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 572–73 (holding that direct marketing of defendant's products to at least three architectural firms located in the forum, national advertising in catalogs and direct mail campaigns reaching the forum state, in addition to $4 million in revenue as well as other contacts with the forum satisfy continuous and systematic contacts to support general jurisdiction). However, advertisements placed in national publications such as trade magazines have been held insufficient to support specific jurisdiction. *See, e.g., Sunbelt Corp. v. Noble, Denton & Assoc.*, 5 F.3d 28, 33 n. 10 (3d Cir.1993) (single ad in a national publication is insufficient to establish the contacts necessary for specific jurisdiction).[30]

Unlike mail-order catalogs sent by a company to potential customers in a particular state, advertisements in trade magazines are indirect forms of advertising in the sense that the entity placing the advertisement has no control over where the catalog is sent and who receives it. *See Dart Int'l Inc. v. Interactive Target Sys., Inc.*, 877 F.Supp. 541, 544 (D.Col.1995). Here, plaintiffs are not claiming that any of these advertisements in *Shotgun News* resulted in a sale tied to a shooting. *See Fidelity & Cas. Co. of New York v. Philadelphia Resins Corp.*, 766 F.2d 440, 447 (10th Cir.1985) (noting that an advertisement appearing in a non-forum state giving rise to the cause of action is not as important as it would have been had the ad been seen and acted upon in the forum state), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 853, 88 L.Ed.2d 893

29. The court was not provided with any evidence regarding the size and area of the circulation of *Shotgun News*. It appears that the magazine is published in Hastings, Nebraska.

30. Advertisements placed in trade or other magazines of national circulation, not specifically directed toward the forum, although read there, are also insufficient to constitute continuous and systemic business contacts for general jurisdiction. *See Land–O–Nod Co. v. Bassett Furniture Indus., Inc.*, 708 F.2d 1338, 1341 (8th Cir.1983) (advertisement expressing an intent to sell infringing bedding products nationally, appearing in a national trade journal, "Bedding Magazine,"

is insufficient to indicate purposeful availment); *Benjamin v. Western Boat Building Corp.*, 472 F.2d 723, 731 (5th Cir.) (regular advertising by defendant in national boating and yachting magazines circulated in the forum state, where advertising is not aimed at citizens of that state "has little jurisdictional effect"), *cert. denied*, 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973); *Hearst Corp. v. Goldberger*, No. 96 Civ. 3620, 1997 WL 97097, at * 11 n. 13 (S.D.N.Y.1997) (noting that national advertisements do not constitute sufficient minimum contacts sufficient for due process) (collecting cases).

(1986). Nor have they provided the court with evidence regarding the amount of sales, from New York or any state, resulting from ads placed in the trade publication. *See Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 700 n. 10 (3rd Cir.1990) (holding that defendant's ads in a national boating magazine provides "at best, tangential support for the assertion of personal jurisdiction" where there is no evidence of the extent of defendant's solicitation in the magazine, nor how much business the company derives from this advertising). More importantly, there is no evidence here of purposeful targeting of the New York forum in the placement of these advertisements.[31] Therefore, this Court does not deem this alleged contact with New York to be particularly weighty.

### 3. Direct Sales

With respect to direct sales in New York, the parties have submitted evidence detailing numbers of direct sales to New York, as well as revenue generated from sales in New York and national revenue. As demonstrated by the chart set forth on page 82 *infra*, detailing for each distributor the number of guns sold and revenue derived over the period of 1992 to 1995, the majority of defendants made direct sales of guns to purchasers in New York State. Indeed, of the distributor defendants remaining in the action,[32] defendants contend that only two— [ ] made no sales during the relevant period and derive *no* revenue from sales in New York. Three other distributor defendants were established after certain of the shootings took place and therefore cannot be held liable under any theory for injuries caused by guns sold prior to the time they entered into the business of distributing handguns.[33] Defendants contend that ten other distributors have sold less than 1% of their total handguns in New York during the time period from 1989 to 1994, and three others, who were unable to obtain specific information, submitted declarations claiming sales of less than 1% in New York. Six others have sold between 1% and 5% of their total sales in New York, and there appear to be two others—[ ] who have sold anywhere from [ ] to [ ] of their total revenue in New York. Defendants contend that, in any event, these sales arise from telephone and mail-in orders, not direct sales or activities by defendants in New York. (Defs.' Mem., dated July 30, 1996, at 7). Accordingly, defendants contend that under a traditional analysis, there is no evidence that defendants had a reasonable expectation that their products would have consequences in New York or that they would be brought into a New York court to answer to these claims for which there is no evidence that any of their guns are involved.

The question for the court then is, in the absence of any other meaningful contacts with New York, at what level of revenue and sales to New York does it become foreseeable that defendants could reasonably expect to be haled into a New York court.

Defendants argue that because they had *de minimis* sales in New York, there is no evidence that they had any reasonable expec-

**31.** Plaintiffs claim that some of the distributors, such as Lipsey's, advertise in catalogs. However, no specific information has been provided as to whom and where these catalogs are sent. In the absence of this information, the court does not deem this a substantial contact either.

**32.** Pursuant to this Court's suggestion, plaintiffs' counsel agreed to voluntarily withdraw the claims against defendants Go Sportsmen's, Inc., Jack First, Inc., J & S Wholesale, Inc., AJ Wholesale Distributors, Inc., and Riley's Inc. (See Pls.' Mem., dated Mar. 3, 1998, at 1). Based on plaintiffs' analysis, it was determined that each of these distributors "had sales in New York that amounted to less than one percent of their national sales even when you consider the potential firearms that could have been supplied to New

York through the underground market." (*Id.* at 6).

**33.** Specifically, Bangers L.P. in Birmingham, Alabama was first established in November 1992; Eagle Exim, Inc., located in Roseville, California, was established in March 1991 [ ] and Schaub Distributors, Inc. in Pascogoula, Mississippi was not in business until July 1993. Both Schaub and Eagle Exim are no longer in business. Thus, none of these three distributors could be held responsible for the death of David Johnstone who was shot on July 29, 1992 at a time when these distributors were not selling handguns. Similarly, given that Njuzi Ray was shot on July 27, 1993, Frankie Davis was shot on July 6, 1993, and Stephone Herbin was shot on July 29, 1993, defendants may be able to show that neither Eagle nor Schaub were in the business at the time.

tation that their products would have consequences in New York and therefore *de minimis* revenue from New York sales cannot support the exercise of personal jurisdiction under the C.P.L.R.[34] This Court could find no support for such a proposition in cases involving claims under § 302(a)(3)(ii), and indeed, the cases suggest otherwise. *See, e.g., Kernan v. Kurz–Hastings, Inc.*, 997 F.Supp. at 367 (no sales to the forum but nationwide exclusive sales agreement is sufficient); *American Network, Inc. v. Access America*, 975 F.Supp. at 498 (six subscribers plus an ad on the internet directed to customers across the United States satisfies the C.P.L.R.); *Vecchio v. S & T Mfg. Co.*, 601 F.Supp. at 55 (two workstands ordered for use in New York satisfies the reasonable expectation requirement); *Nichols v. Surgitool, Inc.*, 419 F.Supp. 58 (1,088 surgical devices sold plus advertisements satisfies foreseeability).

To the extent that each of these distributors has directly sold handguns to New York purchasers, this Court finds that the foreseeability requirement of the C.P.L.R. has been satisfied. Certainly, defendants' direct sales to New York constitute evidence of "a discernable effort to directly or indirectly serve the New York market." *Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d at 970, 564 N.Y.S.2d at 866. Moreover, while the actual claims being made by plaintiffs in this case may not have been foreseeable, it is foreseeable that claims relating to defendants' sales of handguns in New York may arise and they would be haled into a New York court. At that time, defendants would then seek to invoke the benefits or protections of New York law. *See Asahi Metal Indus. Co. v. Superior Ct. of Cal.*, 480 U.S. at 102, 107 S.Ct. 1026. Accordingly, with the exception of two of the

distributors who had no actual direct sales to New York, this Court finds that the foreseeability requirement has been met.

This does not, however, end the Court's inquiry. Still remaining is the question of whether these level of sales are sufficient to satisfy the "minimum contacts" requirement of due process, which involves a determination as to whether this is a case of specific or general jurisdiction. Defendants claim that this case is predicated on general jurisdiction. Plaintiffs do not explicitly address this question although, from their citation to *Keeton v. Hustler*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984), a specific jurisdiction case, the court assumes that they take the position that this is a specific jurisdiction case.[35]

Based on the nature of the claims in this case, this Court finds, that with the exception of two defendants who had no direct handgun sales in New York, the distributor defendants fall, if at all, within the specific jurisdiction of the court. This Court finds that plaintiffs have made a sufficient showing that they "would not have suffered the same injur[ies] in the absence of the defendant[s'] contacts with [New York]." *Kernan v. Kurz– Hastings*, 997 F.Supp. at 376. While defendants would argue that plaintiffs' claims do not arise directly from the distributors' direct sales transactions with New York residents, it is not known at this time whether, in fact, the guns used in the shootings at issue were guns sold through the underground market, or whether in fact any of them were the product of a direct sale to a purchaser in New York. Moreover, as the court in *Sollinger v. Nasco Int'l Inc.*, 655 F.Supp. at 1388, noted, "it is not at all clear that in order for the court to assert specific personal jurisdic-

---

34. While clearly, there must be a certain minimum level of New York sales to satisfy the first prong of the test under Section 302(a)(3)(i) which requires "substantial revenue" in New York, that requirement is not present under 302(a)(3)(ii) which requires substantial interstate commerce and which forms the basis of plaintiffs' assertion of jurisdiction here.

35. Plaintiffs cite *Keeton v. Hustler*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984) in support of their argument that defendants whose New York revenue is at least 1% of their total national

revenue have sufficient contacts with New York to assert jurisdiction. In *Keeton v. Hustler*, the Supreme Court found that a national magazine with a monthly circulation of 10,000 to 15,000 in the forum state had sufficient minimum contacts with the state to confer jurisdiction over the defendant who was sued for libel. Although the Court did not set a firm guideline of 1%, it is clear from the lower court's decision that the circulation amounted to less than 1% of the publisher's total circulation, which was sufficient under the circumstances.

tion, due process requires that the suit 'arise directly out of [defendants'] activities in [New York].'" Rather, this Court agrees with *Sollinger's* conclusion that the standards set forth in *Helicopteros Nacionales* and *Burger King* are broader and encompass claims that "relate to" the defendants' activities in the forum. *Id.* at 1388. Clearly, plaintiffs' claims of negligent marketing and oversupply of the market relate not only to indirect sales of handguns but also to the total market for guns, including those sold directly into New York.

Finally, this Court notes that both plaintiffs and defendants have agreed that jurisdiction, if it exists at all, is based on C.P.L.R. § 302(a)(3)(ii), contemplating specific jurisdiction, not § 301 which is the general jurisdiction section of the C.P.L.R. *See Benson & Assocs. v. Orthopedic Network of New Jersey,* No. 98 Civ. 1020, 1998 WL 388531, at *2–3 (S.D.N.Y. July 13, 1998); *NCA Holding Corp. v. Ernestus,* No. 97 CV 1372, 1998 WL 388562, at *3 (S.D.N.Y. July 13, 1998). Accordingly, this Court finds that the analysis of each distributors' situation should be conducted under the framework of an assertion of specific jurisdiction.

Here, given the fact that, with two exceptions, each of the defendants had direct sales of handguns into the New York market, this Court finds that the "purposeful availment" element of due process is satisfied. *See Nowak v. Tak How Invs., Ltd.,* 94 F.3d 708, 717 (1st Cir.1996) (holding that "[i]n order to be subject to Massachusetts jurisdiction, a defendant need only have one contact with the forum state, so long as that contact is meaningful" (citing *McGee v. Int'l Life Ins. Co.,* 355 U.S. at 223, 78 S.Ct. 199 (holding that even a single act can support jurisdiction if it creates a substantial connection with the forum)), *cert. denied,* —— U.S. ——, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997); *Aerogroup Int'l Inc. v. Marlboro Footworks, Ltd.,* 956 F.Supp. 427, 437 (S.D.N.Y.1996).

#### 4. *Individual Distributors*

The caselaw unfortunately does not provide clear lines of demarcation with respect

to the analysis required in this case. Accordingly, this Court has considered absolute numbers of guns sold in New York, total national revenue, percentage of total revenue from guns sold in New York, the nature of the distributors' business, and a comparison between distributors voluntarily dismissed by plaintiffs and those remaining. While this Court, as stated earlier, does not find any precedent that draws a sharp line requiring a defendant's New York revenues to be a certain percentage of total revenues before jurisdiction cannot be asserted, this Court has considered this as a factor in determining whether there are sufficient minimum contacts here given the unusual nature of the tort asserted. In some instances, the nature of defendant's business as demonstrated by its interstate or national revenue figure is so large that it is not unreasonable to expect that the defendant is not only capable of defending itself in a foreign forum but reasonably should have foreseen from its direct New York sales that it could be called into court here. Others, whose annual national revenues appear to be significantly less than [ ], have been dismissed for failure to satisfy the substantial interstate revenue prong of the C.P.L.R. A third group arguably has sufficient interstate sales to qualify under C.P.L.R. § 302(a)(3)(ii), but their New York sales are so *de minimis*—less than [ ] guns sold in a four year period—that this Court questions whether it is reasonable to expect them to answer these charges in New York. Indeed, plaintiffs themselves, in voluntarily dismissing certain other distributors with comparable statistics, appear to recognize the marginal nature of the contacts. While plaintiffs appear to be basing their analysis on a percentage calculation of New York revenue, this Court looked at both absolute numbers and percentage revenue in making its determination.

Having identified the relevant factors, this Court proceeds to analyze the issues of foreseeability and substantial interstate revenue with respect to each of the distributors remaining in the case.[36] The information upon

---

**36.** Unless otherwise noted, the figures referred to in this analysis are the numbers derived from Defendants' Answers to Interrogatories and rep-

resent total numbers, over the relevant period of 1992 to 1995—— not annual numbers. Annual

which this analysis is based is presented in two tables annexed to this report and recommendation.

Several of the distributors clearly satisfy the requirements of the C.P.L.R. and due process, such that this Court is justified in exercising personal jurisdiction over them.

### 1. *AcuSport*

AcuSport is a wholesale distributor of hunting and camping equipment with [ ] of its business in the sale of firearms[37] and ammunition. Its headquarters are located in Bellefontaine, Ohio, with [ ] employees, divided among its headquarters and three branch offices in Pennsylvania, Georgia, and California. It had direct sales of [ ] firearms to New York purchasers during the relevant period, and of its [ ] in annual sales, [ ][38] was generated from sales in New York.

Given the large number of handguns sold in New York, coupled with its substantial interstate revenue, it was foreseeable that AcuSport could be sued in New York courts and thus, the requirements of the C.P.L.R. and the due process requirement of minimum contacts have been satisfied.

### 2. *Bangers, L.P.*

Bangers, L.P., which is a Georgia limited partnership, first began doing business in November 1992.[39] According to the documentation submitted, Bangers distributes handguns only on a wholesale level, with [ ] of its sales in handguns, [ ] in long guns, and the remainder in ammunition, archery equipment, and accessories. Approximately [ ] of Bangers' sales are to customers in [ ]. During the relevant period, Bangers sold [ ] guns directly to New York, generating [ ] in revenue from New York sales alone out of its total national revenue of [ ][40] Based on the total number of handguns sold in New York, coupled with its clearly substantial interstate revenue, this Court finds that the requirements of the C.P.L.R. have been satisfied and that there are sufficient minimum contacts to hale Bangers into court in New York.

### 3. *Brazas Sporting Arms*

Although defendants describe Brazas, located in Monson, Massachusetts, as a "small family business," [ ] employees and as a wholesale distributor of firearms, firearms accessories and ammunition, Brazas sold [ ] firearms directly to New York in the relevant period. Of its total national revenue of [ ] over [ ] was derived from New York sales.[41] These sales satisfy the "substantial interstate revenue" requirement of the C.P.L.R. and the minimum contacts and foreseeability requirements as well.

### 4. *Chattanooga Shooting Supplies*

Chattanooga Shooting Supplies, which also does business as Natchez Shooters Supply,[42] is a wholesale distributor of over 27,000 different products, located in Chattanooga, Tennessee, with [ ] employees. Among the items sold by Chattanooga, which include CB radios, watches, diamonds, athletic shoes, clothing, and police equipment, [ ] of its

---

numbers would be approximately one quarter of the total.

**37.** It should be noted that "firearms" include not only handguns, but also rifles, long guns etc.

**38.** According to the declaration of David K. Ray, AcuSport's Vice President of Finance and Administration, dated July 25, 1996, approximately [ ] of AcuSport's revenue is derived from sales in New York. (Ray Aff. ¶ 6).

**39.** Accordingly, Bangers could not have sold the weapon used to shoot David Johnstone, who was shot on July 29, 1992.

**40.** Bangers provided New York and national sales and revenue data for 1992 through April

1996, noting that to provide a state by state breakdown "would require the only computer programmer employed by [Bangers] to stop doing the various day-to-day operations" to perform the necessary steps to retrieve the information——a task that would require several days, at a minimum. (Decl. of Donald Bowers, dated April, 29, 1997, ¶ 12).

**41.** By their own admission, Brazas derives approximately [ ] of its revenue from New York sales. (Aff. of Robert N. Brazas, dated July 24, 1996, ¶ 6).

**42.** The company has supplied pages of *Shotgun News,* advertising in the name of Natchez Shooters Supply.

sales are derived from the wholesale distribution of firearms and ammunition to dealers. According to the information provided by defendants, Chattanooga sold only [ ] firearms in New York during the period from 1994 to April 1996, generating [ ] in revenue. Its total national revenue for the years 1992 to April 1996 was [ ] with New York sales representing [ ] of the total.[43]

Based on its significant interstate revenue,[44] this Court finds that even though it sold only guns, which is a relatively small absolute number, its contacts are more than sufficient for it to have foreseen that it might be haled into New York to answer to claims related to its business in New York.

### 5. Davidson Supply Co.

Davidson Supply Co. originally opened in North Carolina, and then in 1988, it opened a branch in Prescott, Arizona. In 1992, the company transferred all of its operations to the Arizona location. Davidson has sold over [ ] guns in New York over the relevant time period, at a revenue of [ ]. Although this represents only [ ] of its total revenue, Davidson's total national revenue amounts to [ ]—clearly "substantial" enough to satisfy the requirements of the substantial interstate revenue prong of C.P.L.R. § 302(a)(3)(ii). This Court finds that the sales of over [ ] guns to New York satisfies both the foreseeability and minimum contacts requirements of the C.P.L.R. and due process, respectively.[45]

### 6. Hill Country Wholesale, Inc.

Hill Country Wholesale has [ ] employees and is a Texas corporation, located in Austin, Texas, with a small branch in Bryan, Texas (one employee) and a branch in Little Rock, Arkansas ([ ] employees, [ ] in sales). Hill is a wholesale distributor and exporter of firearms, ammunition and accessories, with [ ] of its firearms sales in handguns. For 1992 to 1996, Hill provided figures showing sales to New York of [ ] guns. Its estimated annual national revenue was calculated to be approximately [ ] with its New York revenue representing only [ ] of the total. Like Chattanooga, this Court finds that although a close call, Hill's substantial interstate revenue is sufficient to satisfy the requirements of the C.P.L.R. and, given this Court's finding that this is a specific jurisdiction case, even the minimal sales here are enough to warrant the exercise of jurisdiction over Hill.

### 7. Kiesler Police Supply, Inc.

Kiesler Police Supply has [ ] employees and is located in Jeffersonville, Indiana. Only [ ] of its business is derived from the retail sales of firearms, accessories, and ammunition. The majority of its sales [ ] are made to wholesale distributors and [ ] of all of its handguns are sold to law enforcement. During the relevant time frame, Kielser sold [ ] guns directly to New York, generating [ ] in New York revenue or [ ] out of a total of [ ] in national revenue. Although the absolute number of guns sold in New York is relatively small, this Court finds that like Hill Country and Chattanooga, Kiesler's substantial interstate revenue, coupled with direct sales to New York, provides sufficient minimum contacts for purposes of establishing specific personal jurisdiction and respect-

**43.** Chattanooga is one of the distributors who advertises in *Shotgun News*. Its full page ads contain listings of available handguns, with prices and some photographs and a notation "call toll-free from anywhere in U.S.A., includes Alaska, Hawaii, and Canada." (Ex. 6 to Barnes Certif.). However, since there is no evidence that Chattanooga, or any other distributor for that matter, has targeted New York in its advertisements, this Court has not considered these ads to be significant in evaluating minimum contacts for any of the defendants.

**44.** Chattanooga provided only limited sales and revenue information, stating that to provide oth-

er requested information would be "an overwhelming task." (Decl. of Robert Johnston, III, Chattanooga Firearms Buyer, dated Sept. 30, 1997, ¶ 4). In the absence of any information demonstrating that the [ ] in total annual revenue is derived purely from local sales, this Court infers that Chattanooga has a significant number of interstate sales.

**45.** Davidson advertised in *The Shotgun News*, although the ad presented to the Court was for a semi-automatic SKS, and not a handgun.

fully recommends that Kiesler remain in the case.[46]

### 8. *Lew Horton Distributing Co.*

Lew Horton is a wholesale distributor of firearms, shooting sports, hunting, and camping supplies, located in Westboro, Massachusetts. Approximately [ ] of its business is in the sales of firearms and ammunition, selling [ ] firearms nationally during the relevant period, with [ ] sold directly to purchasers in New York. Of the [ ] in national revenue, over [ ] or [ ] was generated from New York sales alone. Under well-established precedents, this constitutes sufficient minimum contacts and sufficient substantial interstate revenue to assert jurisdiction over Lew Horton.[47]

### 9. *Lipsey's Incorporated*

Lipsey's, which is located in Baton Rouge, Louisiana does not engage in the retail distribution of firearms, but rather sells only wholesale. Lipsey's supplied information only for one year—1995 to April 1996—and did not provide pre–1995 figures because they "installed a new computer system in 1995" and would have to reprogram the system (Decl. of Drew LeBlanc, dated May 29, 1997, ¶ 9), or review the physical records which would be an "enormous project." (*Id.* ¶ 10). Keeping in mind the limited nature of the information provided and construing the numbers in plaintiffs' favor, this Court finds that even though an absolute number of [ ] guns sold directly to New York is small, and New York revenue constitutes only of the total national revenue, Lipsey's total national revenue of [ ] is substantial enough to justify denying defendant's motion to dismiss at this time in the absence of any other information to assist the court in its evaluation.

### 10. *Nationwide Sports Distributors, Inc.*

Nationwide is another distributor that provided the court with very little concrete data,

asserting that its computer records for firearms sales for 1989 to 1996 "were purged from the system" and that although "printouts of this information are available ... the information is not sorted in a manner that makes the information available." (Decl. of Richard Malak, Controller of Nationwide, dated May, 1997, ¶ 8, 9). However, from the limited information provided, it is apparent that Nationwide's headquarters is located in Southhampton, Pennsylvania, with additional branches in Pennsylvania, Sparks, Nevada and Melbourne, Florida. It is also apparent that Nationwide does a substantial amount of interstate sales—[ ], out of a total estimated revenue of [ ] million. Given that there has been no representation that Nationwide does not sell firearms in New York, coupled with the fact that between [ ] and [ ] of its revenues are from the sale of firearms, this Court finds that it is fair to infer that Nationwide sells firearms in New York.[48] Therefore, given its substantial interstate revenue and the absence of any other relevant information, this Court recommends that defendant's motion to dismiss Nationwide be denied.

### 11. *RSR Wholesale South, Inc.*

RSR is a wholesale distributor of firearms, ammunition and shooting sports equipment. Located in Winter Park, Florida, RSR South has a number of related companies including RSR Group, Inc. and RSR Management Corp., both located in Winter Park, Florida. In addition, there are RSR Wholesale Guns Ohio, Inc., located in Cleveland Ohio; RSR Wholesale Guns North Carolina, located in Greensboro, North Carolina; RSR Wholesale Guns West, Inc., incorporated in Nevada; RSR Wholesale Guns Texas, Inc., incorporated in Grand Prairie, Texas; RSR Wholesale Guns Midwest, Inc., located in Milwaukee, Wisconsin; and RSR Wholesale Guns, Inc., incorporated in Redmond, Washington with a branch office in Rochester, New York.

---

**46.** Plaintiffs submitted two advertisements from Kiesler appearing in the April 1993 and September 1995 editions of *Shotgun News.*

**47.** Lew Horton advertised "The Shorty Forty" in the April 10, 1993 edition of *Shotgun News.*

**48.** Indeed, Nationwide admits that it does a "significant" portion of its business with states, including New York. (Decl. of Richard Malak, dated May, 1997, ¶ 4).

During the relevant period, RSR sold [ ] guns in New York, generating a total national revenue of [ ] Again, although in absolute numbers, its New York sales are less than [ ] it does have a branch office or related entity incorporated in New York and operating in Rochester, New York. Moreover, it appears that of RSR's total national revenue of [ ] a substantial portion is derived from interstate revenue. Like Hill Country, Chattanooga and some others, RSR could be said to have sufficient interstate business and sufficient minimum contacts with New York to expect to be brought into court here.

### 12. *Sports South, Inc.*

Sports South is a wholesale distributor of firearms and related products. Sports South did not provide sales data for New York or national sales data, noting that the "cost and business interruption would be substantial." (Decl. of Markham A. Dickson, President, dated Sept. 30, 1997). However, from the information provided, it appears that Sports South, which has employees located in Shreveport, Louisiana, does a significant amount of interstate revenue, providing total national revenue figures of [ ] of which [ ] is derived from direct sales to New York.

Under the existing precedents, this Court finds that there is clearly substantial interstate revenue and that there are sufficient minimum contacts shown by this amount of revenue to justify plaintiffs' assertion of personal jurisdiction here.

A second group of distributors clearly fall outside the jurisdiction of this Court based on an absence of contacts with New York or interstate revenue that is so small it cannot be considered substantial.

### 1. *Gunarama and Micro Sight*

At least two of the distributor defendants—Gunarama and Micro Sight—have submitted affidavits indicating [ ]. Indeed, Gunarama is a small distributor with [ ] employees, located in Spokane, Washington. It sells not only firearms, but sporting goods as well, with [ ] of its business in the distribution of fishing tackle and camping goods.

From statistics presented by Gunarama, it appears that it sold a total of [ ] firearms in the relevant period, and that of its total national revenue of [ ] over the relevant period, the majority of it comes from five states—[ ] Moreover, according to the Declaration of Larry Schierman, President of Gunarama, customers beyond the northwest are not solicited by Gunarama.

Similarly, Micro Sight, which is located in Belmont, California, is a wholesale distributor of hunting sports equipment, including firearms, which distributes "almost exclusively" to [ ]. According to the affidavit of Inge Diodati, General Manager of Micro Sight, [ ] customers.

In the absence of any evidence indicating other ties to New York and the regional nature of their respective business, this Court finds that it would not be foreseeable to either of these distributors to expect to be haled into New York. Therefore, since plaintiffs have failed to allege sufficient facts to make out a prima facie case for personal jurisdiction with respect to these two defendants, this Court need not conduct the constitutional due process analysis and finds that under a traditional jurisdictional analysis, the claims against Gunarama and Micro Sight should be dismissed.

It should be noted that if plaintiffs' methodology of attributing "indirect" sales to New York from other states were applied to these two distributors, plaintiffs would attribute [ ] gun sales to Gunarama and [ ] to Micro Sight, [ ] to New York. Apart from the fact that there is no evidence of purposeful availment by either of these distributors under plaintiffs' theory, it is unclear to this Court how plaintiffs derived the figures for these two distributors, particularly since neither one sells to any of the top eight states identified by plaintiffs as major contributors to the underground market. Because this Court finds that plaintiffs' theory fails to satisfy the purposeful availment component of the minimum contacts requirements of due process with respect to these two distribu-

tors, it is respectfully recommended that the claims against them be dismissed.

### 2. *Graf & Sons, Inc.*

Graf & Sons is described as "a family business started in 1957," with [ ] employees, located in South Mexico, Missouri. According to its submission, [ ] of Graf's business is derived from the wholesale and retail sales of reloading components; including "shot, wads, primers, powders ammunition, and firearms accessories." (Decl. of Marjorie Graf, Secretary, dated May 1, 1997, ¶¶ 1–3). The remaining [ ] relates to the sale of firearms, with Graf & Sons selling [ ] of its guns in the region of [ ]. Although Graf did sell a minimal number of handguns to New York retailers over the period of 1993 to 1995,—specifically, [ ]—this Court finds that its average annual revenue of [ ][49] does not constitute substantial interstate revenue for purposes of C.P.L.R. § 302(a)(3)(ii). Since this Court finds that plaintiffs have failed to set forth facts sufficient to satisfy the interstate revenue prong of Section 302(a)(3)(ii), this Court recommends that the claims against Graf be dismissed. Even if this Court were to consider plaintiffs' attribution of indirect sales, which would increase the number of guns sold from [ ], the amount of interstate revenue still does not appear to be substantial enough to satisfy the requirements of C.P.L.R. § 302(a)(3)(ii).[50]

### 3. *Eagle Exim and Schaub Distributors, Inc.*

Two relatively small distributors—Eagle Exim and Schaub Distributors—sold guns for a limited time during the relevant period and have since ceased selling firearms or gone out of business altogether. The number of guns sold directly to New York was *de minimus* in both cases—[ ] by Eagle Exim during 1993–1995 and [ ] by Schaub from July 1993 to 1995—and neither one had substantial interstate revenue.

Eagle, which was first incorporated in March 1991, is located in Roseville, California, and appears to be primarily a local distributor with anywhere from [ ] employees. According to the affidavit of Donald A. St. Pierre President of Eagle Exim, [ ] of its revenues were obtained through the sale of ammunition to distributors, and the export of wine to China, with the largest number of handguns ever sold in one year being [ ] During the relevant period, its national revenue was [ ] or an average annual revenue of [ ]. Recently, Eagle downsized its operations and no longer sells firearms at all.[51]

Similarly, Schaub, which was located in Pascagoula, Mississippi, seems to have generated less than [ ] in national revenue annually. It has recently gone out of business completely and counsel has filed a request to withdraw based on Schaub's inability to pay attorneys' fees to defend this case. Given that Schaub's interstate revenue must be less than the national revenue figure once intrastate sales are deducted, this Court finds that the substantial interstate revenue prong of C.P.L.R. § 302(a)(ii) has not been satisfied.[52]

Moreover, even if the interstate revenue were ultimately determined to be sufficient, in conducting a "reasonableness inquiry," this Court finds that subjecting Eagle Exim and Schaub to suit in New York "would be contrary to 'traditional notions of fair play and substantial justice.'" *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 575. First, the burden on these two defen-

49. This number is derived by dividing [ ] its gross revenue over the relevant period, by four years.

50. Graf advertised in the September 10, 1995 edition of *Shotgun News*. In that ad, a Missouri area code and a separate phone and fax number for Australian customers were provided.

51. Eagle advertised in the April 10, 1993 and September 10, 1995 editions of *Shotgun News*.

52. Under plaintiffs' theory of attributing "indirect" sales through the underground market, Eagle Exim would have sold [ ] firearms instead of a mere [ ], and Schwab would be held accountable for selling [ ] firearms instead of [ ]. However, given their insubstantial interstate sales, this Court finds that both Eagle Exim and Schaub are so small as to make it unfair to subject them to jurisdiction in New York.

dants to defend in this forum is extremely serious, given that they are out of business and all of their records, files, and possible witnesses are located in California and Missouri, respectively. Second, the efficient administration of justice factor also weighs against suit in New York given the location of evidence and the difficulties in dealing with the entities which, at this time, have little if any means to defend the suit. While the forum clearly has an interest in providing redress to its citizens, and in providing a convenient forum to pursue their claims, given the questionable ability of these two defendants to even satisfy a judgment when coupled with the burden on them to defend here, this Court respectfully recommends that the claims against them be dismissed.

With respect to a third group of distributors, which fall somewhere in the middle of the spectrum based on comparative contacts with New York and interstate revenue, this Court makes the following recommendations.

### 1. *Alamo Leather Goods*

Alamo is a small business with [ ] employees, located in San Antonio, Texas, that distributes firearms and firearms accessories, in addition to police equipment, such as tear gas, handcuffs, batons, and cleaning products. During the relevant time period, Alamo sold only guns directly to New York, deriving [ ] in revenue from New York sales over a four year period, which constituted [ ] of its total national revenue of [ ], over the relevant period. According to its submission, Alamo does about [ ] of its business in [ ].

This company is clearly a small, generally localized business with less than [ ] of its revenue generated from New York. It is comparable in size and revenue percentage to some of the others voluntarily dismissed by plaintiffs. For example, plaintiffs voluntarily dismissed their claims against Go Sportsmen's Supply, which sold [ ] guns directly to New York, representing [ ] of its interstate revenue of [ ]. Indeed, Go is arguably larger and has more of an interstate presence, given its offices in Montana and Idaho, than some of the other distributors considered by this Court in this report.

Similarly, J & S Wholesale, also voluntarily dismissed by plaintiffs, sold [ ] guns directly to New York, with its New York revenue of [ ] constituting [ ] of its national revenue of [ ]. Of the other distributors voluntarily dismissed by plaintiffs, AJ Wholesale Gun Distributors, which is located in Phoenix, Arizona, provided very little statistical information. However, it appears that during the relevant period, AJ's sold only [ ] guns in New York. J & S Wholesale, Inc. is a wholesale distributor of firearms, of which [ ] to [ ] guns included in their total New York sales were shipped directly to co-defendant RSR Wholesale South, Inc. Jack First, Inc., also voluntarily dismissed, is described as a family business which was originally located in California and then relocated to South Dakota in July 1994. According to its submission, approximately [ ] of its retail sales were to California customers and then, following its relocation, [ ] of its sales were to South Dakota customers. It had no sales to New York during the relevant period. The fifth and final distributor voluntarily dismissed, Riley's Inc., sold only [ ] handguns in New York during the relevant time period and provided no revenue figures. According to plaintiffs, these distributors were dismissed because their sales to New York even when taking indirect sales into account, amounted to less than of the total revenue.

Although it appears that Alamo generates sufficient interstate revenue to qualify under C.P.L.R. § 302(a)(3)(ii), this Court finds that its sales of only [ ] guns and an annual revenue of less than [ ] per year from New York just barely satisfies the minimum contacts requirements for due process. Moreover, under a comparative analysis, this Court can find no principled way to distinguish Alamo from Go Sportsmen's or J & S Wholesale. Based on a consideration of the relevant factors, this Court finds that it would not be reasonable to subject Alamo to suit in New York under a traditional analysis. This Court recommends dismissal of the claims against Alamo.

### 2. *Fox Wholesale*

Fox Wholesale is a wholesale distributor of firearms, firearms accessories and ammuni-

tion, which does [ ] of its business with customers [ ]. According to Fox's records, it sold only [ ] handguns directly to purchasers in New York, although it apparently brokers approximately [ ] annually in firearms through New York for sale outside the United States. Of its [ ] in total national revenue, only [ ] is generated from direct New York sales.

Although its total national revenue suggests that there is sufficient interstate revenue to satisfy the second prong of C.P.L.R. § 302(a)(3)(ii), the total absolute number of guns is comparable, if not less than, other distributors who were voluntarily dismissed by plaintiffs. (*See* discussion at 61–62 *supra*). For the reasons stated earlier with respect to Alamo, this Court finds that it would be inequitable to require Fox to defend against this case in New York.

### 3. *Point Sporting Goods Co.*

Point described itself as "essentially a family business," started by the current owner's father in 1923. (Decl. of Bill DeBot, President, Apr. 24, 1997, ¶ 1). It is located in Stevens Point, Wisconsin, with a branch in St. Paul, Minnesota. Approximately [ ] of its business is derived from the sale of fishing equipment. Firearms sales make up approximately [ ] of the total, while the remainder is derived from sales of archery equipment, targets, scopes, and other accessories. From the information provided, it appears that Point had [ ] firearms sales to New York in the relevant time period, generating [ ] of the total [ ]. Given the comparable nature of Point's business with that of some of the other distributors voluntarily dismissed by plaintiffs, this Court respectfully recommends that the claims against Point be dismissed as well.

In making the recommendation for dismissal as to these marginal defendants, this Court has evaluated the "reasonableness" of requiring these distributors to defend in this forum. Clearly, these New York plaintiffs have a strong interest in obtaining relief in one jurisdiction without the need to chase each distributor in its home forum. Similarly, as noted above, New York's interest in providing a forum to adjudicate the claims of its residents, coupled with the express interests of the legislature in strict gun control weigh in favor of exercising jurisdiction here.

In evaluating the burden to the defendants for which dismissal is recommended, this Court recognizes that it will be burdensome for all of the distributors to litigate the case in New York. However, in determining whether there is a "special or unusual showing of inconvenience," *see Aerogroup Int'l Inc. v. Marlboro Footworks, Ltd.*, 956 F.Supp. at 437 (citing *Nowak v. Tak How Invs., Ltd.*, 94 F.3d at 718), with respect to these three distributors, this Court finds that their burden "is magnified by the cost of defending this complex litigation," *id.*, when none of them sold a significant number of weapons into the New York market. Specifically, where the defendants are generating less than [ ] in annual revenue from New York, the expense of litigating this case is so disproportionate to the economic impact of these sales on their business that it cuts against the exercise of jurisdiction.

Where as here, there is a weak showing of minimum contacts, there must be a stronger showing of reasonableness. I find that it would be unreasonable to exercise jurisdiction over these distributors— all of whom had less than [ ] direct sales to New York and derived less than [ ] annually in New York revenue— particularly where other comparable distributors have been voluntarily dismissed from the case. To hold these distributors in the case would "offend 'traditional notions of fair play and substantial justice.'" *Metropolitan Life Ins. Co. v. Robertson–Ceco Corp.*, 84 F.3d at 568 (quoting *International Shoe v. Washington*, 326 U.S. at 316, 66 S.Ct. 154).

Again, as noted earlier, this Court has not recommended adoption of an analysis that would determine personal jurisdiction based on an attribution of indirect sales to each distributor. Indeed, such an analysis would potentially affect only these three distributors. With respect to Alamo, Fox, and Point, plaintiffs have attributed the following in indirect sales to these distributors as compared to direct sales to New York

| Distributor | Direct Sales | Indirect Sales |
|---|---|---|
| Alamo | | |
| Fox | | REDACTED |
| Point | | |

However, this Court finds that these indirect sales are not sufficient contacts to give these defendants "fair warning" that they may be subject to jurisdiction in New York. As the Court noted in *World–Wide Volkswagen Corp. v. Woodson*, due process "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." 444 U.S. at 297, 100 S.Ct. 559. In essence, the analysis of indirect sales which plaintiffs seek to have this Court apply is based on a series of assumptions applied generally to all of the distributors. In evaluating a similar argument based on an estimation, the court in *Cortlandt Racquet Club, Inc., v. Oy Saunatec, Ltd.*, 978 F.Supp. at 527 n. 4, noted: "[T]o engage in the sort of speculation proposed by plaintiff would be to remove any concrete factual predicate from the jurisdiction equation, and would thereby undermine the most basic constitutional tenet of jurisdiction—to provide a defendant with fair notice that its activities might render it amenable to suit in a particular jurisdiction." Accordingly, this Court recommends the use of the traditional analysis and that Alamo, Point and Fox be dismissed.

The final group of distributors include those who provided only minimal, if any, information.

1. *Scott Wholesale Company, Inc.*

Scott Wholesale is one of the distributors who failed to provide the Court with sufficient information to analyze its interstate revenue and New York contacts. According to the information presented, Scott has [ ] employees and is a "small family business" selling firearms and accessories wholesale, and is located in Indian Trial, North Carolina. The only information provided as to its sales was that it sold [ ] handguns to New York purchasers during the period of 1991 through April 1996, generating [ ]

Scott provided no national revenue or sales figures, due to limitations in its computer system and the voluminous numbers of records. According to the April 24, 1997 declaration of Larry Vickery, the president and a shareholder of Scott Wholesale, Inc., dated April 24, 1997, approximately [ ] of the company's sales are in [ ].

Dun & Bradstreet reports, however, indicate that Scott has annual revenue in the area of $7,300,000. Since it is impossible to tell from the limited information provided by defendants how much of this is attributable to interstate sales and how much is due to intrastate sales, this Court respectfully recommends that Scott's motion to dismiss be denied pending development of further information through discovery.

2. *SG Distributing Inc. and SOG International, Inc.*

SG is a wholesale distributor of firearms, ammunition, hunting clothes, fishing tackle and accessories. It is located in Chino, California and approximately [ ] of its total revenue is generated through the sales of firearms. SG failed to provide information regarding its sales/revenue data in New York or even total figures, asserting: "[SG] is unable to determine handgun sales by state or customer without reviewing each and every transaction made by [SG] during the years sought. [SG] is unable to undertake this project without severely interrupting its ongoing business operations and incurring great expense." (Decl. of Christopher T. Vella, dated June 5, 1997, ¶ 10).

Similarly, SOG which is located in Lebanon, Ohio, provided no information, representing that its "computer records are not maintained in a manner such that the information sought is available. The only way to obtain the information plaintiffs seek is to manually review [SOG's] log books .... this project would take six months or longer." (Decl. of Richard W. Herdtner, dated May, 1997, ¶ 11).

It should be noted that unlike several other distributors, neither SG nor SOG have claimed that they made no direct sales to New York during the relevant period. Rath-

er, both SG and SOG indicate that less than [ ] of their revenues are derived from direct sales to New York, suggesting that there are minimal sales to New York purchasers.

Accordingly, in the absence of any meaningful information from which to evaluate SG's and SOG's claims that personal jurisdiction is lacking here, and recognizing that all relevant information is in the hands of the defendants, this Court respectfully recommends that SG's and SOG's motion to dismiss be denied.

### Conclusion

Based on this Court's analysis, it is respectfully recommended that the claims against Alamo, Eagle Exim, Fox, Gunarama, Graf & Sons, Micro Sight, Point Sporting Goods, and Schaub be dismissed and that the defendants' motions to dismiss the remaining distributors— AcuSport, Bangers, Brazas, Chattanooga, Davidson, Hill Country, Kiesler, Lew Horton, Lipsey's, Nationwide, RSR South, Sports South, Scott, SG Distributing and SOG International——be denied.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within ten (10) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989).

The Clerk is directed to mail copies of this Report and Recommendation to the parties.

#### DIRECT SALES & REVENUE: 1992—1995

| Distributor [53] | Total number of guns sold nationally | Number of sales in New York | New York sales percentage | Total national revenue | New York revenue | New York revenue percentage |
|---|---|---|---|---|---|---|
| | | | REDACTED | | | |
| | | | REDACTED | | | |

---

**53.** The distributors designated by an asterisk have been voluntarily dismissed from the litigation on motion by plaintiffs. They remain in the charts for comparative purposes only.